IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARK STRICKLAND,

    *Plaintiff,*

    v.

                                 Civil Action No.: ELH-11-00622

CARROLL  COUNTY,  MARYLAND
et al.,

    *Defendants.*

**MEMORANDUM OPINION**

Plaintiff Mark Strickland, who is self represented, filed suit[1] against the State of Maryland (the "State"); Carroll County, Maryland ("Carroll County" or the "County"); Carroll County Sheriff Kenneth Tregoning; Carroll County Deputy Sheriff Jeffrey Miller; the Carroll County State's Attorney's Office ("SAO" or "Carroll County SAO"); Carroll County State's Attorney Jerry Barnes; and several individual members of the Carroll County SAO:  Allan Culver, Esquire; David Daggett, Esquire; Maria Oesterreicher, Esquire; and Arian Noma, Esquire.[2]  The forty-six page Complaint contains twenty-four counts, relating to civil rights violations allegedly committed against Strickland.

Plaintiff seeks compensatory and punitive damages in excess of $2 billion, plus interest and costs.  Complaint at page 41 ¶ 1 to page 46 ¶ 24.  He also seeks "a preliminary and permanent injunction…preventing Defendants from further depriving Plaintiffs of their rights

---

[1] I shall refer to plaintiff's "Amended Complaint #1" (ECF 64), titled "Federal & State Civil Rights Violations And Intentional Torts," as the "Complaint."  Because plaintiff is proceeding *pro se*, his filings have been "'liberally construed'" and are "'held to less stringent standards than formal pleadings drafted by lawyers.'"  *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citation omitted).

[2] Defendants Barnes, Culver, Daggett, Noma, Oesterreicher, and the SAO are collectively referred to as the "SAO defendants."

under the Constitution and laws of the United States and the State of Maryland," *id.* at 46 ¶ 25, and asks for "declaratory relief as to the party's [sic] respective rights and duties," *id.* at 46 ¶ 26, plus "all attorney and/or personal fees plus costs and such other and further relief as the Court may deem just and proper." *Id.* at 46 ¶ 27.

The SAO defendants and the State (collectively, the "State defendants") jointly filed a "Motion To Dismiss First Amended Complaint Or, In The Alternative, For Summary Judgment" ("State Motion," ECF 48), as well as a supporting memorandum ("State Memo," ECF 48-1).[3] In response, plaintiff filed his own motion for summary judgment (ECF 53), a "Motion In Opposition To State Defendants [sic] Motion To Dismiss Or In The Alternative, Summary Judgment" (ECF 55), and a supportive memorandum ("Opposition to State," ECF 55-1).[4] The State defendants subsequently replied and opposed plaintiff's summary judgment motion ("State

---

[3] Numerous exhibits are appended to the State Motion, including the Declaration of Culver (Exhibit 1); the Declaration of Oesterreicher (Exhibit 2, which includes a log of cases brought against plaintiff and two other persons, Angela Schwartz and John Jeskey, Jr.); a copy of a "Tort Complaint" filed by plaintiff in the Circuit Court for Carroll County (the "State litigation") (Exhibit 3); defendants' "Motion To Dismiss, Or, In The Alternative, For Summary Judgment" as to the State litigation, along with a supporting memorandum and declarations of Daggett and Oesterreicher from the State litigation (Exhibit 4); plaintiff's motion for summary judgment filed in the State litigation, along with a Motion To Quash and the Declaration of the National Security Agency (Exhibit 5); a "Memorandum Opinion And Order," and another order, both issued in the State litigation (Exhibits 6 and 7); plaintiff's notice of appeal in the State litigation (Exhibit 8) and acknowledgment of that filing (Exhibit 9); and electronic case records for plaintiff and Jeskey (Exhibits 10 and 11).

[4] Plaintiff appended numerous exhibits to his Opposition, including electronic case records (Exhibits 1 and 7); screenshots of a MySpace profile for a user named "bigshow118" (Exhibits 2 and 5); a "Denial Of Petition For Final Protective Order" (Exhibit 3); a medical record for Schwartz (Exhibit 4); an electronic case record for Jeskey (Exhibit 6); a memorandum dated December 17, 2009, directed to plaintiff from "Jess Flanagan, Prosecution Assistant" (Exhibit 8); a cartoon (Exhibit 9); a "Criminal Investigation Report" dated December 17, 2009 (Exhibit 10); and a screenshot of a MySpace profile for a user named "Mark" (Exhibit 11).

Reply," ECF 59).[5]   Thereafter, plaintiff filed "Plaintiff's Reply to Defendant's [sic] Reply" ("Surreply to State," ECF 60).

Tregoning and Miller jointly filed a "Motion To Dismiss The Amended Complaint Or, Alternatively, For Summary Judgment" ("Sheriffs' Motion," ECF 66), as well as a supporting memorandum ("Sheriffs' Memo," ECF 66-1).[6]   In response, plaintiff filed a motion for summary judgment (ECF 71), an opposition to the Sheriffs' Motion (ECF 70), and a supporting memorandum ("Opposition to Sheriffs," ECF 70-1).   After Tregoning and Miller replied ("Sheriffs' Reply," ECF 73), plaintiff filed a "Reply To Defendants Tregoning and Miller's Opposition To Plaintiff's Motion For Summer Judgment" ("Surreply to Sheriffs," ECF 76).

Carroll County filed a "Motion To Dismiss The Amended Complaint Or, Alternatively, For Summary Judgment" ("County Motion," ECF 65), as well as a supporting memorandum ("County Memo," ECF 65-1).[7]   In response, plaintiff filed an opposition (ECF 68), a supporting memorandum ("Opposition to County," ECF 68-1),[8] and a motion for summary judgment (ECF 69).   The County replied and opposed plaintiff's summary judgment motion ("County Reply," ECF 72).   Thereafter, plaintiff filed his "Reply To Defendant Carroll County, MD Opposition To

---

[5] The State defendants appended numerous exhibits to their Reply, including a copy of "Plaintiff's Response to State's Motions For Summary Judgment And Dismissal" filed in the State litigation (Exhibit 12); plaintiff's "Memorandum Of Law In Support Of Reconsideration Or Leave To Amend Motions," dated September 24, 2010, filed in the State litigation (Exhibit 13); a supplemented version of that document, dated September 30, 2010 (Exhibit 14); and several handwritten forms relating to plaintiff's appeal of the State litigation (Exhibit 15).

[6] Miller's Affidavit is appended to ECF 66 as Exhibit 1.   A letter to plaintiff from Sharon Barry, "Claims Manager," dated March 22, 2010, is appended as Exhibit 2.

[7] A letter to plaintiff from Kimberly A. Millender, "County Attorney," dated September 8, 2010, is appended to the County Motion as Exhibit 1.

[8] A "Domestic Violence Unit Mission Statement" is appended as Exhibit 1.

Plaintiff's Motion For Summer Judgment" ("Surreply to County," ECF 75).[9]

The issues have been fully briefed, and the Court now rules pursuant to Local Rule 105.6, as no hearing is necessary.

## Factual Background[10]

Plaintiff, an African American male, is the owner of IT-1 Consulting, Incorporated. Complaint ¶¶ 1-2.  He was previously involved in a relationship with a Caucasian female, Angela Schwartz.  *Id.* ¶ 18.  Schwartz subsequently became involved with a Caucasian male, John Jeskey, Jr.  *Id.* ¶ 20.  The facts underlying plaintiff's claims spring largely from the tangled interactions of plaintiff, Jeskey, and Schwartz, and were also the subject of litigation initiated by plaintiff in the Circuit Court for Carroll County, Maryland in April 2010 ("State litigation").

On February 1, 2009, Strickland allegedly assaulted Schwartz.  *Id.* ¶ 27.  She sustained a lesion to her chin.  *Id.* ¶ 33.  Plaintiff took Schwartz to the hospital on the evening of February 1, 2009, claiming she "had fallen down his balcony steps while intoxicated [and] was high on drugs."[11]  *Id.* ¶ 31.  In March 2009, Schwartz "filed for and received a Temporary Protective Order against the Plaintiff in the District Court for Carroll County."  *Id.* ¶ 18.

Plaintiff alleges that in March 2009 his then fifteen year old daughter "skip[ped] school"

---

[9] Plaintiff's "NOTICE Of CLAIM," sent to "Commissioner Steven Powell, Chief of Staff, Carroll County" and "Kimberly A. Millender, Carroll County Attorney," dated September 7, 2010, is appended as Exhibit 1.  A United States Postal Service Certified Mail Receipt for "Kimberly Miller," dated September 7, 2010, is attached to the Surreply to County as Exhibit 2.

[10] The record is quite voluminous.  Although the underlying facts are largely undisputed, the parties' interpretation of those facts is at times quite disparate.  The Factual Background is presented in the light most favorable to plaintiff, but indicates where the parties disagree, and uses defendants' versions to fill in gaps omitted in plaintiff's account.

[11] In ¶ 89 of the Complaint, plaintiff claims that Schwartz had a cocaine addiction and that Jeskey was her supplier.

to be with Schwartz and Jeskey, "without the knowledge or permission of either parent." *Id.*[12] Plaintiff also complains that Jeskey became "friends" with plaintiff's daughter on MySpace, a social networking website. *Id.* ¶ 21. "[O]ut of concern for his daughter's well being," *id.*, Strickland "began to research the background of Jeskey." *Id.* He learned that Jeskey's MySpace profile featured nudity and "racist innuendo," *id.*, and that Jeskey "was a dealer of cocaine and other illegal drugs." *Id.* ¶ 22. Therefore, plaintiff asked Jeskey to "refrain from speaking/associating" with his daughter. *Id.* ¶ 23. However, Jeskey refused, and used a racial epithet and profanity in that conversation. *Id.* ¶ 24. Plaintiff "then informed Jeskey that he was aware of his illegal activities and if he did not stop corresponding with plaintiff's daughter, plaintiff would inform the police." *Id.* Plaintiff did so on or about May 28, 2009. *Id.* ¶ 26.

In June 2009, shortly after plaintiff informed the police about Jeskey's illegal drug activities, Schwartz filed criminal charges against plaintiff as to his alleged assault of February 1, 2009. *Id.* ¶ 27. As a result, plaintiff was arrested in July 2009, while on business at the National Security Agency ("NSA") in Fort Meade, Maryland. *Id.* ¶ 28. Plaintiff claims that, as a result of the arrest, his NSA badge was seized and his business relationship with NSA was terminated. *Id.* ¶ 29. According to plaintiff, Schwartz "continually fil[ed] baseless charges against him—done in an effort to have plaintiff's [Department of Defense] Top Secret Security Clearance revoked, in retaliation" for his having reported Jeskey's "illegal drug activity." *Id.* ¶ 62.

In August 2009, Oesterreicher, the assistant state's attorney to whom the assault case was assigned, subpoenaed Schwartz's medical records of February 1, 2009. *Id.* ¶ 36. However, Oesterreicher asked the hospital to redact "any medical history regarding alcohol or drug abuse,

---

[12] It is undisputed that plaintiff's daughter "skipped school." However, Daggett avers in his Declaration, State Motion Exh. 4, at ¶ 5, that the child's mother told him she had "permitted the daughter to be with Angela Schwartz."

or mental instabilities." *Id.*[13] Schwartz testified at a preliminary hearing in September 2009. *Id.* ¶ 35. She recalled that, on the night of February 1, 2009, plaintiff choked her until she became unconscious and kicked her in the ribs. *Id.*

Also in August 2009, Schwartz filed an action with the district court commissioner, alleging that plaintiff had violated the temporary protective order "by calling her residence and a cellular telephone owned by John Jeskey." *Id.* ¶ 39. Schwartz also alleged that plaintiff "sent Internet links to nude pictures of Schwartz, to Jeskey via text messages," *id.* ¶ 41, and that plaintiff "fraudulently opened a website in the name of Schwartz." *Id.* ¶ 42.

On August 19, 2009, "SA Oesterreicher filed criminal charges against the plaintiff in the District Court for Carroll County." *Id.* ¶ 40.[14] Records later showed that the text messages had not been sent from plaintiff's phone. *Id.* ¶¶ 45-46. Moreover, although the website on which plaintiff posted the nude images of Schwartz was called "Angiebroomall.com," Schwartz's maiden name, "Ms. Schwartz had given permission for the pictures [to be taken] and Mr. Strickland was not pretending to be her when he purchased the web site [sic]." State Motion Exh. 4 at 6. Therefore, in 2010 the charges against plaintiff were nolle prossed. Complaint ¶ 47. *See also* State Motion Exh. 4, Decl. of Daggett, ¶ 4.

Plaintiff asserts that he complained to the Maryland State Police and the SAO that Jeskey sent him text and audio messages containing racist pictures and messages, and that Jeskey and an

---

[13] Plaintiff asserts that this was in an effort to exclude what he contends was exculpatory evidence. *See* Complaint ¶ 80. Oesterreicher explains in her Declaration, State Motion Exh. 2 ¶ 3, that she "did so because it [was her] understanding that federal and State law impose special limitations on the disclosure and admissibility of such information, not out of any desire to avoid information that Mr. Strickland believes may have been exculpatory." Further, she avers: "In fact, I can not think of a time when I subpoenaed medical records that did not expressly exclude records relating to substance abuse or mental health issues." *Id.*

[14] In ¶ 43 of his Complaint, plaintiff claims he was charged with fraud (identity theft), in violation of Md. Code, § 8-301(c)(2)(i) of the Criminal Law Article, and violation of an ex parte protective order, in violation of Md. Code, § 4-509 of the Family Law Article.

unknown Caucasian male once blocked plaintiff's exit from a restaurant while whistling "Dixie." Complaint ¶ 48.  According to plaintiff, in October 2009 the SAO "refused to accept" a charging document regarding these complaints.  *Id.*  He also alleges that he was "physically attacked" at a restaurant by "friends of Jeskey," who allegedly used racial epithets against him, but the "Carroll County Government refused to help the plaintiff."  *Id.* ¶ 49.[15]

In October 2009, plaintiff filed charges against Jeskey "at the Carroll County Commissioner's Office," alleging that plaintiff "received numerous harassing and racist telephone calls" from him.  *Id.* ¶ 50.  Although plaintiff was instructed to appear in court to testify, *id.* ¶ 52, plaintiff claims that, once Daggett "noticed the plaintiff was the victim," Daggett instructed the prosecutor assigned to the case "to call and inform the plaintiff that the state would not pursue the action."  *Id.* ¶ 53.  According to plaintiff, Daggett told him "that he had no intention [of] pursuing the charges," but "would not provide" an explanation for that decision. *Id.* ¶ 55.  Daggett explained in his Declaration, submitted in the State litigation, that the charges filed by Strickland were nolle prossed on February 2, 2010, because "[r]ecords indicated that the harassment went both ways."  State Motion Exh. 4, Decl. of Daggett ¶ 7.[16]  Earlier that same month, according to plaintiff, he had asked Daggett to file perjury charges against Schwartz if her allegations regarding the alleged telephone harassment proved false, but Daggett "laughed and said no."  Complaint ¶ 56.

---

[15] Plaintiff does not state when these incidents occurred, what "help" he sought, or who refused to help.

[16] Daggett also noted in his Declaration that plaintiff had filed a number of other charges against Jeskey and Schwartz, including theft and kidnapping.  The kidnapping claim related to the March 2009 incident in which Jeskey and Schwartz spent the day with plaintiff's daughter when she should have been in school.  *Id.* ¶ 5.  The theft claim related to plaintiff's assertion that "Schwartz had stolen a key to his home and a handgun was missing from his residence." Complaint ¶ 93.

Also in October 2009, in the District Court for Carroll County, plaintiff "applied for and received a Peace Order on behalf of his minor daughter, against Jeskey and Schwartz." *Id.* ¶ 57. Because it was "obvious" to Strickland that Jeskey and Schwartz "had been speaking to plaintiff's daughter during the time in which the Peace Order was in effect," *id.*, plaintiff "filed charges against Jeskey and Schwartz for violating the Peace Order." *Id.* ¶ 58. According to plaintiff, the SAO "refused to investigate the charges filed by the plaintiff." *Id.* ¶ 59. The charge was nolle prossed on December 18, 2009. *Id.* ¶ 8; State Motion Exh. 4, Daggett Decl. ¶ 8. Daggett explained that, as plaintiff "continue[d] to file charges against Ms. Schwartz and Mr. Jeskey," the SAO "use[d its] discretion on whether to prosecute." Daggett Decl. at ¶ 9.

Jeskey's criminal record, State Motion Exh. 11, shows that several drug related charges were brought against him in the District Court for Carroll County in February 2010. One resulted in a guilty plea in June 2010, for which Jeskey received probation before judgment. According to plaintiff, however, the charges were nolle prossed. Complaint ¶ 26.

On February 23, 2010, plaintiff was tried in the Circuit Court for Carroll County on charges of assault. He was acquitted at a bench trial. State Motion Exh. 4, Daggett Decl. at ¶ 3.

In March 2010, plaintiff "filed for harassment charges against Schwartz for continually filing baseless charges against him."[17] *Id.* ¶ 62. However, the "Carroll County Commissioners" did not accept the charging documents filed by plaintiff. *Id.* ¶ 64. According to plaintiff, the commissioners sent a letter to plaintiff advising him of a new policy, i.e., that Culver had

---

[17] Despite his characterization of Ms. Schwartz's filings as "continual," plaintiff only points to the assault charge, and the related charges of identity theft and violation of the protective order.

"instruct[ed] them not to accept any charging documents filed by the plaintiff, without the consent of [the SAO]." *Id.*[18]

Culver avers in his Declaration that his position as "District Court Supervisor" required him "to oversee the [SAO's] interaction with the District Court, including the process by which applications for statements of charges are received and reviewed in [the SAO]." State Motion Exh. 1 ¶ 1.  He acknowledges that in March 2010 he "sent a letter to the Carroll County District Court Commissioners Office requesting that any applications for charges filed by either Mr. Strickland or Mr. Jeskey be reviewed by [the SAO] before any charges [were] issued." *Id.* ¶ 3.[19] He explains, however, that this "is a common practice exercised by our office whenever two parties are filing numerous applications…requesting charges regarding an ongoing dispute." *Id.* Culver relates that he was "concerned that Mr. Strickland and Mr. Jeskey were trying to enlist the criminal process to retaliate against one another." *Id.* ¶ 4.  But, he maintains that his concern "applied to both men, not just Mr. Strickland." *Id.*

According to plaintiff, on two other occasions the SAO failed to investigate or pursue charges leveled by him against Schwartz and Jeskey.  He maintains that the SAO "failed to investigate allegations whereby John Jeskey illegally accessed plaintiff's private computer files via the internet." *Id.* ¶ 73.  Further, he asserts that the SAO "refused to accept and/or investigate a charging document filed by the Plaintiff against Schwartz swearing to the fact that Schwartz had stolen a key to his home and a handgun was missing from his residence," yet "the Defendants knew or should have known that Schwartz had addictions, was unemployed, and was therefore unable to support her addictions, thereby intentionally withholding its protective

---

[18] The letter is not included in the record.

[19] A copy of this letter is not part of the record.

services to the plaintiff…." *Id.* ¶ 93.[20]   Plaintiff also alleges that he reported to the Maryland State Police, in October 2010, that "while in the front yard of his home, he was shot at by an unknown assailant and no investigation was conducted." *Id.* ¶ 109.

Plaintiff asserts that Jeskey viewed plaintiff's MySpace page and provided screenshots or printouts of it to Oesterreicher, although the MySpace page was "available to only those on the plaintiff's friend list during June of 2009." Opposition to State at 33.  As plaintiff asserts that Jeskey was not on plaintiff's "friend list," plaintiff concludes that Jeskey "'hacked' myspace [sic] to get it." *Id.* at 33-34.  Oesterreicher averred in her Declaration in the State litigation, State Motion Exh. 3, that plaintiff's MySpace page was "public" and could be accessed "by anyone even if you are not signed onto a MySpace account." *Id.* ¶ 2.

Further, plaintiff asserts: "The State of Maryland, Carroll County and it's [sic] officials retaliated against the plaintiff…by harassing him and order[ing] him to be arrested by Carroll County Deputy Miller, while the plaintiff was in the Carroll County District Court on a matter that did not involve them." Complaint ¶ 76.  Although it is not clear from any of the submissions what matter specifically brought plaintiff to the courthouse that day, plaintiff asserts that it was "another litigation with Ms. Schwartz." Opposition to Sheriffs at 6.

According to plaintiff, on March 24, 2010, Noma instructed Miller to arrest plaintiff for driving on a suspended license, a charge that was nolle prossed in October 2010.  Complaint ¶ 77.  Plaintiff avers that the arrest was in retaliation for his "writing a BLOG documenting his experiences" with the SAO.  *Id.*  In Strickland's view, defendants were "attempting to silence plaintiff's criticism of SAO's racial animosities." *Id.* ¶ 85.  Plaintiff also claims that, during the arrest, Miller "laughed," and he saw Schwartz "dr[iving] around….laughing." *Id.*

---

[20]  Plaintiff provides no further details regarding the key and handgun.  The "illegally accessed…private computer files" apparently refers to plaintiff's MySpace page.

In his affidavit, Deputy Miller asserts that Noma "advised" him on March 24, 2010, that plaintiff, "whose driver's license was suspended, had been seen, earlier that day, driving by the Carroll County Court House by court personnel."  Sheriffs' Motion Exh. 1 ¶ 3.  Deputy Miller states in his Affidavit, *id.* ¶¶ 4-6:

> 4. Based upon that information, I conducted a routine check of the records of the Maryland Motor Vehicle Administration ("MVA") to determine whether Strickland's driver's license was, in fact, suspended.  The records check confirmed that Strickland's license was suspended on October 27, 2009 based upon his failure to pay child support….
> 5. At approximately 5:19 p.m., on March 24, I was on patrol, traveling eastbound on Maryland Route 140…when I observed Strickland stopped in the left hand turn lane of westbound Route 140….I activated the emergency equipment on my patrol vehicle and initiated a traffic stop.[21]
> 6. ….After I confirmed Strickland's identity, I arrested him for driving a motor vehicle on a public roadway with a suspended driver's license.

In his affidavit, Miller does not comment on whether he "laughed" during the arrest.

Plaintiff does not dispute that, at the time of his arrest in March 2010, his driver's license had been suspended.  And, defendants concede that, the "day after his arrest, Strickland's driving privileges were reinstated by the State."  Sheriffs' Memo at 6.

Strickland commenced the State litigation in the Circuit Court for Carroll County, Maryland on April 19, 2010, Case No. C-10-56317.  In particular, he sued the State, the SAO, Barnes, Daggett, and Oesterreicher,[22] seeking compensatory and punitive damages as to seven claims: "Violation of 1st Amendment Rights (Freedom of Speech)," "Violation of 6th Amendment Right (Subpoena)," "Violation of 14th Amendment Rights (Equal Protection)," "Intentional Infliction of Emotional Distress," "Defamation," "Violation of 5th Amendment

---

[21] Miller notes that the interception of plaintiff on Route 140 was not merely fortuitous; he states that "[a]t approximately 5:15 p.m. on March 24, 2010, a court bailiff from the Carroll County District Court called the Carroll County Sheriff's Office and indicated that [Strickland]…was leaving the courthouse and was walking towards his vehicle." *Id.* ¶ 2.

[22] Alicia Leibowitz, of the Women's Law Center of Maryland, was also named as a defendant in the State litigation. *Id.* She is not a named defendant in the case at bar.

Rights (Due Process)," and "Deprivation of Rights Under Color of Law & CIVIL CONSPIRACY." *See* State Motion Exh. 3.[23]   Circuit Court Judge J. Barry Hughes granted summary judgment to the defendants on August 20, 2010.  State Motion Exh. 6.  After the denial of plaintiff's motion for reconsideration on October 29, 2010, State Reply Exh. 15, plaintiff noted an appeal on November 18, 2010.  *Id.*  The Maryland Court of Special Appeals dismissed the appeal on October 26, 2011, pursuant to Md. Rule 8-602(a)(8).  *See Strickland v. State*, No. 2131, Sept. Term 2010 (filed Oct. 26, 2011).  The mandate issued on November 28, 2011.  On March 8, 2011, while plaintiff's appeal of the State litigation was pending, he filed the instant suit.[24]

## *Count 1*

In Count 1, brought against Carroll County; Tregoning; Miller; and the SAO defendants, plaintiff asserts a claim under 42 U.S.C. § 1983.  He alleges that these defendants violated his rights under the First, Fourth, Sixth, Eighth, and Fourteenth Amendments by:

- "Allowing Jeskey to illegally access [plaintiff's] private files via the Internet," Complaint ¶ 91;
- "withholding exculpatory evidence, performing acts to frame the plaintiff for crimes he did not commit; for sabotaging his ability to earn a living…by continuing to file criminal charges against him without probable cause[,] and arresting and detaining him against his will without legal justification," *id.* ¶ 92;
- "intentionally withholding…protective services to the plaintiff," *id.* ¶ 93;
- "den[ying] the Plaintiff of Equal Protection of the Law and Equal Access to the court system," *id.* ¶ 95;

---

[23] Plaintiff's claims in the State litigation will be discussed in further detail, *infra*, at 25.

[24] Plaintiff brings several overlapping claims.  For example, he sets forth several § 1983 claims, alleging different violations in each count, against different groups of defendants.  In addition, plaintiff frequently asserts claims against certain defendants without specifying how or why they are implicated in the conduct of which he complains.  Accordingly, for the sake of accuracy, I have set out plaintiff's claims as he articulates them.

- "violat[ing] his 1st amendment rights in retaliation for speaking out against those in power and for writing BLOGS demonstrating the injustices perpetrated against him," *id.* ¶ 96;[25]
- "seizing him without probable cause…and detaining him for crimes he did not commit," *id.* ¶ 97;
- "subject[ing] the plaintiff to cruel and unusual punishment," *id.* ¶ 98; and
- "denying [plaintiff's] right to have a witness testify on his behalf." *Id.* ¶ 99.[26]

*Count 2*

In Count 2, filed against Carroll County; Tregoning; Miller; and the SAO defendants, plaintiff asserts claims under 42. U.S.C. § 1981, 42 U.S.C. § 1982, and 42 U.S.C. § 1983. He alleges:

- "Criminal Charges filed by the plaintiff were never investigated, and recently not even accepted by the Carroll County SA[O], thereby denying the plaintiff equal access and equal protection," *id.* ¶ 103;
- "White citizens of the County, namely Jeskey and Schwartz, were allowed to file complaint after complaint against the plaintiff, each one being acted upon…[e]ven when the complaints were the same," *id.* ¶¶ 104-105;
- "Defendants…prohibited the Plaintiff from exercising existing and new contracts by virtue of the illegal and unconstitutional actions against him," *id.* ¶ 106;
- "Defendants have stripped the Plaintiff [of his] statutory right to sue and to give evidence," *id.* ¶ 108;
- "Plaintiff has suffered punishment for alleged crimes that he has not committed whereas white citizens who have committed those same crimes against him…were not punished at all," *id.* ¶ 110; and
- "Plaintiff has been unable to benefit at all from the laws…in the same manner in which white citizens enjoy those protections." *Id.* ¶ 111.

---

[25] Plaintiff claims that the alleged retaliatory actions were "in the form of baseless prosecutions, and a harassing course of conduct." *Id.* ¶ 96. Later in his Complaint, plaintiff suggests that the alleged retaliation was prompted by his filing "a complaint against [defendants] with the Maryland State Treasury Office in an effort to comply with the Maryland Tort Claims Act." *Id.* ¶ 126.

[26] Plaintiff alleges that Oesterreicher "pretend[ed] to submit a motion to quash plaintiff's subpoena" for an unnamed witness. *Id.* ¶ 99.

*Count 3*

Count 3, brought against Miller and the SAO defendants,[27] asserts a claim under 42 U.S.C. § 1985.  Plaintiff alleges that these defendants conspired to:

- "violate the Civil Rights of the plaintiff by not allowing him to file charging documents against those who had performed criminal actions against him," *id.* ¶ 113;
- "to ruin the professional life of the plaintiff by continuing to file baseless charges against him," *id.* ¶ 114; and
- "to stop him from speaking out against the injustices that were occurring against him."  *Id.* ¶ 115.

*Count 4*

In Count 4, lodged against Carroll County and the SAO defendants, plaintiff asserts another § 1983 claim, complaining that the defendants "charg[ed] African American citizens of crimes based upon accusation by white citizens without any form of investigation…which deprived the plaintiff [of] his right to equal protection and treatment under the law, and denied him access to the Court System."  *Id.* ¶¶ 121-122.  Plaintiff puts forth a theory of supervisory liability as to Barnes and Culver, alleging that they "knew or should have known that the…actions taken by the [prosecutors] under their supervision…posed a pervasive and unreasonable risk of constitutional injury to the plaintiff" and that they are consequently "directly responsible for the constitutional injuries to the plaintiff."  *Id.* ¶¶ 117-118.  Plaintiff also alleges "deliberate indifference to the rights and privileges of the plaintiff" on the part of Barnes, Daggett, Oesterreicher and Culver.  *Id.* ¶ 119.  As for Carroll County, plaintiff alleges that Barnes, Daggett, and Culver were "agents  of the County, and thus the County directly caused the injuries suffered by the plaintiff."  *Id.* ¶ 120.

_____

[27]  In the captions of Counts 3 and 7, plaintiff also refers to Shawn Larson, Esq., who allegedly represented Jeskey.  *Id.* ¶ 68.  However, Larson is not listed as a defendant in the caption of the Complaint and was not served.  Therefore, he is not a party.

*Count 5*

Count 5, brought against the County, Tregoning, and the SAO defendants, asserts another § 1983 claim.  Plaintiff complains that the defendants interfered with "his right in raising his child in the way he sees fit," *id.* ¶ 124, by thwarting his efforts to "deny contact between his minor daughter" and Jeskey and Schwartz.  *Id.*  He also reiterates that defendants "preclude[d] the plaintiff from earning a living," *id.* ¶ 125; that they "retaliated against [him]," *id.* ¶ 126; that they "refused to investigate and at times accept criminal complaints he filed against white citizens," *id.* ¶ 127; and that they charged him with "criminal acts without probable cause or having investigated whether or not the charges instituted [were] valid or could be proven."  *Id.* ¶ 129.  Further, plaintiff alleges that defendants "fabricat[ed] evidence" against him, *id.* ¶ 128; "fraudulently amend[ed] charges filed by the plaintiff," *id.* ¶ 130; and knowingly presented perjured testimony against him, from a witness plaintiff alleges testified as the result of "coercion and intimidation."  *Id.* ¶¶ 131, 133.[28]  These allegations do not appear in plaintiff's statement of facts, and it is unclear to which proceedings they relate.

*Count 6*

Count 6 sets forth a § 1983 claim against the County; the Carroll County SAO; Barnes; Oesterreicher; Daggett; and Culver.  According to plaintiff, Oesterreicher committed "numerous 'Brady' violations,"[29] *id.* ¶¶ 135-136; "did intentionally and with malice fail to inform the plaintiff of a State's witness…until the day of trial," *id.* ¶ 138; and suborned perjury.  *Id.* ¶¶ 139-141.  Plaintiff claims "Carroll County is liable to the plaintiff for damages" related to this

---

[28] Plaintiff suggests charges pending against the unnamed witness were "dropped prior to her testimony" and that there was "no previous notice…that [she] would be called as a witness." *Id.* ¶ 131.  Thus, plaintiff claims he "was denied effective assistance of counsel and an unfair trial." *Id.*

[29] A "Brady violation" is committed when a prosecutor withholds exculpatory evidence from the defense.  *See Brady v. Maryland*, 373 U.S. 83 (1963).

conduct.  *Id.* ¶ 137.[30]

### Count 7

In Count 7, lodged against Carroll County, Miller, and the SAO defendants, plaintiff asserts § 1983 and § 1985 claims, claiming that these defendants "conspired together in an effort to restrict the plaintiff's access to the Carroll County Court System," *id.* ¶ 143, and "harassed the plaintiff while in Carroll County District Court."  *Id.* ¶ 144.  The harassment of which plaintiff complains is his arrest for driving on a suspended license.  *Id.*

### Count 8

In Count 8, brought against Carroll County; the Carroll County SAO; Barnes; Oesterreicher; Daggett; Culver; and Tregoning, plaintiff asserts a § 1986 claim, alleging that the "unconstitutional actions" of which he complains "were carried out with a malicious intent" and that "those in authority had a duty to prevent these acts, but did nothing."  *Id.* ¶ 148.

### Count 9

In Count 9, brought against the State, the County, Miller, and the SAO defendants, plaintiff asserts violations of Articles 19, 21, 24, 26, and 40 of the Maryland Constitution. Plaintiff also reasserts violations previously claimed under the United States Constitution: improper seizure of his person, *id.* ¶ 151; denial of "the opportunity to question witnesses against him and to have witnesses in his favor," *id.* ¶ 152; retaliation for "sp[eaking] out against the CC SAO," *id.* ¶ 154; denial "of governmental protective services," *id.* ¶ 162; and "denying and/or refusing to accept charging documents filed by him."  *Id.* ¶ 163.  Plaintiff also asserts that the County has a "'First Come, First Served' complaint policy," *id.* ¶ 156, which "neither responds

---

[30] It is unclear why defendants Barnes, Daggett, and Culver were named in this count.

to nor investigates cross complaints, but merely accepts the initial complaint as the only viable complaint." *Id.* ¶ 74.

### Count 10

Count 10, filed against the State; Carroll County; the SAO; Miller; Noma; Oesterreicher; and Daggett, asserts a claim of "Malicious Prosecution—State Law," based on plaintiff's arrest for driving on a suspended license and "two malicious prosecutions." *Id.* ¶ 167.[31]

### Count 11

In Count 11, lodged against the State, Carroll County, Miller, and the SAO defendants, plaintiff asserts a claim of "Tortious Interference with Prospective Advantage." He alleges that these defendants made "untrue statements to the National Security Agency," which were "calculated to damage the Plaintiff's lawful business." *Id.* ¶ 172.[32]

### Count 12

In Count 12, brought against the State; Carroll County; Miller; and the SAO defendants, plaintiff asserts a claim of "Intentional Interference with a Business Relationship." He alleges that defendants "intentionally filed untrue criminal charges against the plaintiff…in an effort to interfere with his lawful business relationships." *Id.* ¶ 179.

### Count 13

In Count 13, filed against the State; Carroll County; Miller; and the SAO defendants, plaintiff asserts a claim of "Negligence & Gross Negligence—State Law." He alleges that

---

[31] I assume that the "two malicious prosecutions" refer to plaintiff's prosecutions for assault and fraud.

[32] In his statement of facts, plaintiff does not allege that defendants made any such statements. He suggests that Schwartz and Jeskey told a Department of Defense Investigator that he "was involved in child pornography," *id.* ¶ 174, but Schwartz and Jeskey are not named as defendants.

defendants "breached a duty owed to the Plaintiff [by] fil[ing] false criminal charges against him" and "performing negligent investigations." *Id.* ¶ 182-83.

### Count 14

Count 14, brought against the State; Carroll County; the SAO; Barnes; Daggett; and Tregoning, asserts a claim of "Negligent Supervision."  Plaintiff alleges that these defendants failed to take "reasonable care in ensuring [their] employees/agents were fit and reliable," *id.* ¶ 188, and "were aware of or received training regarding actions that offend the US and MD State Constitutions and common law . . . ." *Id.* ¶ 189.  Alternatively, plaintiff alleges: "If the named defendants were aware and did receive training regarding [these] issues. . .then defendants have displayed a deliberate indifference to the rights and privileges afforded to the plaintiff by the United States and MD Constitutions. . . ." *Id.* ¶ 191.

### Count 15

In Count 15, filed against the State; Carroll County; the SAO; and Miller, plaintiff asserts a claim of "State Law False Arrest."  He complains that he "was detained without his consent and without legal justification…." *Id.* ¶ 194.

### Count 16

In Count 16, brought against the State; Carroll County; the SAO; and Miller, plaintiff asserts a claim of "State Law False Imprisonment."   He contends that he "was detained….without his consent and without probable cause." *Id.* ¶ 196.

### Count 17

Count 17, lodged against Carroll County; the SAO; and Miller, asserts a claim for "False Arrest & Imprisonment."  Plaintiff alleges that he "was seized, handcuffed and incarcerated

without his consent and without probable cause."[33]  *Id.* ¶ 198.

<center>*Count 18*</center>

In Count 18, brought against Carroll County; the SAO; Daggett; Oesterreicher; Noma; Miller; and Barnes, plaintiff asserts a claim of "Malicious Prosecution via Fourth Amendment."[34] He alleges that the defendants "maliciously continued criminal actions against the plaintiff," all of which "terminated in [his] favor."  *Id.* ¶¶ 200-201.  The "three occasions" to which plaintiff refers are described as "Assault Case," "PO/Fraud Case," and "Driving Under Suspended License Case."  *Id.* ¶ 200.

<center>*Count 19*</center>

In Count 19, filed against all defendants, plaintiff asserts a claim of "Intentional Infliction of Emotional Distress."  He alleges that he was subjected to unlawful seizures, *id.* ¶¶ 203-204, which caused him "severe emotional distress."  *Id.* ¶ 205.

<center>*Count 20*</center>

Count 20, brought against Carroll County; the SAO; Oesterreicher; Barnes; Noma; Daggett; and Miller, asserts a claim of "Retaliatory Prosecution."  It is largely duplicative of other claims.

<center>*Count 21*</center>

In Count 21, lodged against the State; Carroll County; the SAO; Oesterreicher; Barnes; Noma; Daggett; and Miller, plaintiff asserts a claim of "Defamation & Invasion of Privacy— False Light."  He alleges that the defendants "publicized…false criminal charges to the

---

[33] Count 17 differs from Counts 15 and 16 in that it is brought under § 1983, not "state law."

[34] Count 18 differs from Count 10 in that it is brought under § 1983, not "state law."

<center>19</center>

Plaintiff's customer, NSA[,] and in other public media forums when they knew or should have known they were false…." *Id.* ¶ 213.

*Count 22*

Count 22, instituted against the State; Carroll County; the SAO; Daggett; and Oesterreicher, asserts a claim of "Fraud & Fraudulent Concealment."  Plaintiff alleges that Daggett "fraudulently changed charges filed by the Plaintiff from telephone harassment to plain harassment…in an effort to frame the Plaintiff for a crime he did not commit."  *Id.* ¶220.[35] Plaintiff also asserts that Oesterreicher "fraudulently misrepresented material facts to the Court...in the form of a Motion to Quash," *id.* ¶223, committed *Brady* violations, *id.* ¶¶ 224, 226, and failed, prior to trial, to "provide the list of witnesses the State would call."  *Id.* ¶ 225.  This claim appears to have been brought against the State, the County and the SAO under a theory of vicarious liability.

*Count 23*

In Count 23, brought against the State and Carroll County, plaintiff asserts a claim of "Vicarious Liability Under Respondeat Superior."  He asserts: "The State and The County are vicariously liable for constitutional torts perpetrated against the plaintiff through official policies or customs enacted by its government officials."  *Id.* ¶ 228.

*Count 24*

In Count 24, instituted against the State, Carroll County, and the SAO defendants, plaintiff asserts a claim under Title VI of the Civil Rights Act of 1964, under a theory of "Intentional Discrimination / Disparate Treatment & Retaliation."  Strickland contends that defendants "enacted customs and policies whereby they enforce laws in a manner to

---

[35] It is unclear how allegedly changing charges filed *by* plaintiff implicates plaintiff in criminal activity.

disadvantage disfavored minorities," *id.* ¶238, and "retaliated against the Plaintiff because he chose to exercise his constitutional rights." *Id.* ¶ 237.

Additional facts will be included in the Discussion.

<center>**Discussion**</center>

<center>*Standard Of Review*</center>

All of the defendants have moved to dismiss, pursuant to FED. R. CIV. P. 12(b)(6), or, in the alternative, for summary judgment, pursuant to Fed. R. Civ. P. 56.   Plaintiff opposes the defense motions and has also filed his own motions for summary judgment.

Ordinarily, summary judgment is inappropriate if "the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011).   However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).   Generally, in order to raise the issue that discovery is needed, the non-movant must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)).   Failure to file a Rule 56(d) affidavit "is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Evans*, 80 F.3d at 961.   *But see Harrods Ltd.*, 302 F.3d at 244 ("[I]n some cases courts have held that summary judgment was premature even when the opposing party failed to file a [Rule 56(d)] affidavit.").

Although the parties have not engaged in discovery, no party has filed a Rule 56(d) affidavit as to another party's summary judgment motion.   It is also noteworthy that many of the

<center>21</center>

parties in this case were involved in related litigation in a Maryland State court.  And, the parties have submitted numerous exhibits in support of their positions, the authenticity of which is undisputed.  Therefore, I will construe all the motions as motions for summary judgment.

Under Rule 56(a), summary judgment is properly granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing former FED. R. CIV. P. 56(c)).  The non-moving party must demonstrate that there are disputes of material fact so as to preclude the entry of judgment as a matter of law.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To meet this burden, the party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Id.*; *see In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999).  Stated another way, "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts'" showing that there is a dispute of material facts.  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former FED. R. CIV. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex Corp.*, 477 U.S. at 322-24.

A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  In resolving the motion, the Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted), *cert. denied*, 540 U.S. 822 (2003).  The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  If "the evidence is such that a reasonable jury could return a verdict" for the non-moving party, there is a dispute of material fact that precludes summary judgment.  *Id.* at 248.

*Claims Against The State Defendants*

Relying on the doctrine of res judicata, the State defendants contend that they are entitled to summary judgment.  They note that plaintiff filed suit in the Circuit Court for Carroll County on April 19, 2010, naming as defendants the State, the SAO, Barnes, Daggett, and Oesterreicher, all of whom were sued in this case, and argue that plaintiff's claims are precluded by the disposition of the State litigation.  The State defendants assert:

> This is now the second time in less than a year that Mr. Strickland has sued the State of Maryland and the Carroll County Office of State's Attorney alleging that Assistant State's Attorneys within that Office violated his civil rights by prosecuting him based on charges filed by his ex-girlfriend and her new lover, while declining to prosecute complaints he lodged about them.

State Memo at 12.  They conclude: "Because the State court adjudicated Mr. Strickland's claims against him on summary judgment, he is barred from re-litigating them here."  *Id.* at 13 (citation omitted).

Plaintiff disagrees with the State defendants' position.  I will discuss his contentions in the context of my analysis.

In *Migra v. Warren City School District Board of Education*, 465 U.S. 75, 81 (1984), the Supreme Court said: "It is now settled that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *See Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 162 (4th Cir. 2008) ("Generally, the preclusive effect of a judgment rendered in state court is determined by the law of the state in which the judgment was rendered."); *Rourke v. Amchem Prods., Inc.*, 384 Md. 329, 344, 863 A.2d 926, 935 (2004). I must look, then, to Maryland law.

In Maryland, it is well settled that "'[a] valid and final personal judgment rendered in favor of the defendant bars another action by the plaintiff on the same claim.'" *FWB Bank v. Richman***,** 354 Md. 472, 492, 731 A.2d 916, 927 (1999) (quoting Restatement (Second) of Judgments § 19 (1982)); *see also, e.g.*, *Anne Arundel County v. Norville*, 390 Md. 93, 106, 887 A.2d 1029, 1036 (2005); *Lizzi v. Washington Metro Area Transit Auth.*, 384 Md. 199, 206-07, 802 A.2d. 1017, 1022 (2004); *Mackall v. Zayre Corp.*, 293 Md. 221, 228, 443 A.2d 98, 102 (1982). This principle of "[b]ar[ring] a party from relitigating a claim that was decided or could have been decided in an original suit," known as claim preclusion, direct estoppel, or res judicata, "was designed to protect 'litigants from the burden of relitigating an identical issue with the same party or his privy and [to promote] judicial economy by preventing needless litigation.'" *Laurel Sand & Gravel, Inc.*, 519 F.3d at 161-62 (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979)); *see also Montana v. United States*, 440 U.S. 147, 153-54 (1979) (recognizing that res judicata avoids the "expense and vexation attending multiple lawsuits, conserves judicial resources" and avoids "inconsistent decisions").

Under Maryland law, the elements of res judicata, or claim preclusion, are as follows: (1) the parties in the present litigation are the same or in privity with the parties to the earlier

24

litigation; (2) the current suit presents the same cause of action or claim(s) as the earlier suit; and (3) there has been a valid final judgment on the merits by a court of competent jurisdiction. *Colandrea v. Wilde Lake Comm. Ass'n.*, 361 Md. 371, 392, 761 A.2d 899, 910 (2000); *deLeon v. Slear,* 328 Md. 569, 580, 616 A.2d 380, 385 (1992). The elements of res judicata under federal law are analogous to those under Maryland law. *See Grausz v. Englander*, 321 F.3d 467, 472 (4th Cir. 2003).

With respect to the first prong, concerning privity, the Maryland Court of Appeals "long ago discarded the traditional requirement of strict mutuality of parties in the context of res judicata and collateral estoppel in civil cases." *Caldor, Inc. v. Bowden*, 330 Md. 632, 657, 625 A.2d 959, 971 (1993). In *deLeon*, 328 Md. at 581, 616 A.2d at 385-86, that court considered whether employees, two nurses, were in privity with their employer, a hospital, for the purpose of res judicata, when the plaintiffs attempted to sue the employees after unsuccessfully bringing the same claims against the employer. The *deLeon* Court held that, for the purpose of res judicata, the employees were in privity with their employer as they were employed by the hospital at the time of the alleged harm, and their challenged conduct was within the scope of their employment. *Id.* at 587, 616 A.2d at 389.

Here, five of the seven State defendants—the State, the SAO, Daggett, Oesterreicher, and Barnes—were defendants in the State litigation. The remaining State defendants, Culver and Noma, were also attorneys in the County SAO at the relevant time, and they clearly stand in privity with their employer. Therefore, I am satisfied that "the parties in the present litigation" are "the same or in privity with the parties to the earlier case." *Id.* at 580, 616 A.2d at 385.

With respect to the second prong, involving the claims at issue, Maryland courts have "adopted the 'transaction' test, as set forth in § 24 of the Restatement (Second) of Judgments, as

25

the basic test for determining when two claims or causes of action are the same for purposes of res judicata." *Id.* at 589, 616 A.2d at 390.  *See Norville*, 390 Md. at 108-09, 887 A.2d at 1038. Under the transactional approach, "'[w]hen a valid and final judgment rendered in an action extinguishes the plaintiff's claim…the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.'"  *de Leon*, 328 Md. at 590, 616 A.2d at 391 (quoting § 24 of the Restatement (Second) of Judgments); *see Batson v. Shiflett*, 325 Md. 684, 699, 602 A.2d 1191, 1199 (1992).   Of import here, "'[n]ewly articulated claims based on the same [transactional] nucleus of facts may still be subject to a res judicata finding if the claims could have been brought in the earlier action.'"  *Laurel Sand & Gravel, Inc.*, 519 F.3d at 162 (citation omitted).  The Maryland Court of Appeals explained in *Norville*, 390 Md. 109, 88 A.2d at 1038:

> Under the transactional approach, if the two claims or theories are based upon the same set of facts and one would expect them to be tried together ordinarily, then a party must bring them simultaneously.  Legal theories may not be divided and presented in piecemeal fashion in order to advance them in separate actions.

A review of the submissions in the State litigation compels the conclusion that the instant case involves the same causes of action or claims as the earlier State litigation, or claims that arise out of the "same nucleus of facts" that undergirded the State litigation.  *deLeon,* 328 Md. at 580, 616 A.2d at 385.  To be sure, plaintiff's Complaint in this case includes more claims than were presented in the State case.  But, the gravamen of both suits is identical.  *See* State Motion Exh. 3.  As the record from the State litigation reveals, plaintiff complained of the same conduct there as he does here: racial discrimination, evidenced by the Carroll County SAO's refusal to prosecute Jeskey and Schwartz, despite plaintiff's contentions that they engaged in improper

contact with his daughter, and committed theft and harassment;[36] the prosecution of plaintiff for assault and fraud;[37] the "policy" of not pursuing plaintiff's complaints, which, according to plaintiff, violated his constitutional rights and deprived him of access to the courts;[38] plaintiff's arrest for driving on a suspended license, which was, in plaintiff's view, wrongful and retaliatory;[39] and prosecutorial misconduct in connection with the cases brought against him.[40]

Plaintiff's attempt to repackage the facts into additional claims is of no effect. "Once a set of facts has been litigated, *res judicata* generally prevents the application of a different legal theory to that same set of facts, assuming that 'the second theory of liability existed when the first action was litigated.'" *Norville*, 390 Md. at 111, 887 A.2d at 1039 (quoting *Gertz v. Anne*

---

[36] In the State litigation, plaintiff asserted that "the State failed to investigate the charges, thereby denying Plaintiff of Equal Protection, and furthermore, endangering the health and welfare of his minor daughter…." *Id.* ¶ 30.

[37] In the State litigation, plaintiff complained that "defendants had first-hand knowledge that those who filed the charges against the plaintiff were not truthful" and "were negligent in that they conducted no investigation into the allegations; but if they did, then there should have been little doubt that the information contained in the charging document was pure fallacy, and [plaintiff's accusers] were woefully misusing our justice system because they were angry that the Plaintiff exposed their drug operation to the police." *Id.* ¶¶ 31, 42.

[38] Plaintiff asserted in the State litigation: "On more than one occasion, the defendant[s] refused to either accept or investigate criminal complaints made by the plaintiff…." *Id.* ¶ 1.

[39] Regarding his arrest for driving on a suspended license, plaintiff alleged in the State litigation, *id.* ¶ 50:

> Defendants conspired with Plaintiff's former spouse, Tammy Wistos and plaintiff's ex-girlfriend, Angela Schwartz, to have the plaintiff arrested while he was attending a hearing in Carroll County District [Court] because he was operating [a vehicle] with [a] suspended license…. The plaintiff's license should never have been suspended, and was reinstated by Child Support Enforcement the next day. However, this demonstrates the extent to which the state has continued to harass Mr. Strickland due to his outspokenness regarding his treatment by the state.

[40] For example, in the State litigation, plaintiff accused Oesterreicher of impropriety in "request[ing] the requisite healthcare provider to provide all medical records for the Plaintiff in the [assault case], ***explicitly excluding*** history [of] mental health and drug and alcohol treatment." *Id.* ¶ 11 (emphasis in original).

*Arundel County*, 339 Md. 261, 270, 661 A.2d 1157, 1162 (1995)).  What the Supreme Court said in *Astoria Federal Savings and Loan Association v. Solimino*, 501 U.S. 104, 107 (1991), is particularly apt: "[A] losing litigant deserves no rematch after a defeat fairly suffered in adversarial proceedings."

With respect to the third prong, pertaining to finality of judgment, "[f]or purposes of *res judicata,* a summary judgment has always been considered a final disposition on the merits." *Adkins v. Allstate Ins. Co.*, 729 F.2d 974, 976 n. 3 (4th Cir. 1984).  *See also deLeon,* 328 Md. at 580, 616 A.2d at 385 (same); Restatement (Second) of Judgments § 19, Comment (g) (1980) (same).  To be sure, plaintiff complains that the State litigation "was never brought to a Trier of fact."  Opposition to State at 9.  But, summary judgment was entered in favor of the defendants in the State litigation, *see* State Motion Exh. 6, and the Maryland Court of Special Appeals subsequently dismissed plaintiff's appeal.  Thus, the State litigation resulted in a valid and final judgment on the merits.   Plaintiff's assertion as to lack of finality merely suggests a misapprehension of the effect of a disposition by way of summary judgment.

Plaintiff also insists that res judicata does not bar the instant case because Barnes, Daggett, and Oesterreicher were not properly served in the State litigation, and thus "they were never legally parties to that 'litigation.'"  Opposition to State at 7.  He also contends that the State court lacked jurisdiction because plaintiff did not comply with the notice provision of the Maryland Tort Claims Act ("MTCA"), Md. Code (2009 Repl. Vol.), § 12-101 *et seq.* of the State Government Article.  *Id.* at 8.[41]  These contentions are without merit.

---

[41] Plaintiff also states that the State litigation was tainted by extrinsic fraud, *id.* at 9, but does not specify what "fraud" occurred.  He asserts that he was denied leave to amend his complaint, *id.*, but does not indicate that he was entitled to amend as of right, or that the denial was "fraudulent."

"[W]hen an attorney enters an authorized appearance on behalf of a party," as counsel for the State defendants did in the State litigation, it "has the effect of waiving any defects of service upon the defendant." *Chapman v. Kamara,* 356 Md. 426, 438, 739 A.2d 387, 393 (1999). Further, pursuant to Rule 2-322(a) of the Maryland Rules of Civil Procedure, defects in service of process are waived if not raised by the *defendant* who was improperly served. In the State litigation, the defendants never asserted a claim of defective service of process. Moreover, the State court included Barnes, Daggett, and Oesterreicher as defendants in the Memorandum Opinion and Order granting summary judgment in their favor. *See* State Motion Exh. 6.

In the State litigation, plaintiff asserted that the action was "filed in accordance with the Maryland Tort Claims Act," State Motion Exh. 5, and a "MTCA denial letter" regarding the State litigation is included in the record. *Id.* Exh. 12. But, assuming, *arguendo*, that plaintiff did not comply with the MTCA, that defect would merely render the judgment *voidable,* not *void*. And, a voidable judgment satisfies the finality requirement for the purpose of res judicata. *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 398-99 (1981) ("'The indulgence of a contrary view would result in creating elements of uncertainty and confusion and in undermining the conclusive character of judgments, consequences which it was the very purpose of the doctrine of *res judicata* to avert'") (citation omitted).

In sum, plaintiff previously litigated in State court the claims lodged here against the State defendants. The parties, the claims, and the operative facts are all duplicative of the State proceedings. Having lost in State court, plaintiff is precluded from taking another bite at the apple in federal court. Therefore, I will grant the State defendants' motion for summary

judgment (ECF 48), and deny plaintiff's motion for summary judgment against the State

defendants (ECF 53).[42]

<div align="center">

*Claims Against Tregoning And Miller*[43]

§ 1985 Claim Against Miller

</div>

In Counts 3 and 7, plaintiff claims that Miller (and others) violated 42 U.S.C. § 1985,

which prohibits conspiracies to interfere with civil rights.

The elements of a § 1985 claim for conspiracy are as follows:

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific
> class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the
> equal enjoyment of rights secured by the law to all, (4) and which results in injury
> to the plaintiff as (5) a consequence of an overt act committed by the defendants
> in connection with the conspiracy.

*Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995).   The conspiracy must be alleged with

specificity and must describe "the time, place, and effect of the conspiracy, including the nature

of the agreement and overt acts in furtherance of the conspiracy."   *Langworthy v. Dean*, 37 F.

Supp. 2d 417, 424-425 (D. Md. 1999).

Plaintiff asserts that Miller, along with the County and the SAO defendants,

- "conspired together to ruin the professional life of the plaintiff by continuing to
  file baseless charges against him, thus rendering him unable to earn a living in his
  profession," Complaint ¶ 114;
- "used baseless accusations against [plaintiff] as a means to stop him from
  speaking out against the injustices that were occurring against him," *id.* ¶ 115; and
- "conspired together in an effort to restrict the plaintiff's access to the Carroll
  County Court System using intimidation and harassment."  *Id.* ¶ 143.[44]

---

[42] In their Motion and Memo, the State defendants also raise prosecutorial and sovereign
immunity as grounds for dismissal or summary judgment.  In light of my finding that plaintiff's
claims against the State defendants are barred by res judicata, I need not reach these claims.

[43] In the same counts of his Complaint in which plaintiff lodges claims against Tregoning
and Miller, he also names other defendants.  However, this section addresses only those claims
as they pertain to Tregoning and Miller.

As the Fourth Circuit has made clear, "to prove a section 1985 'conspiracy,' a claimant must show an agreement or a 'meeting of the minds' by defendants to violate the claimant's constitutional rights." *Simmons*, 47 F.3d at 1377.  Notably, the Court "has rarely, if ever, found that a plaintiff has set forth sufficient facts to establish a section 1985 conspiracy, such that the claim can withstand a summary judgment motion." *Id.*  Moreover, the Court has "specifically rejected section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts." *Id.*

Strickland has baldly asserted that the defendants conspired against him.  However, there is no evidence in the record showing any agreement to violate plaintiff's rights between Miller and any of the other defendants.  The only interaction (of which there is evidence) that Miller had with any of the other defendants, with respect to the events constituting the basis of plaintiff's allegations, is that he was "advised" by Noma that plaintiff's driver's license had been suspended, yet plaintiff had been seen driving.

In *Simmons*, the Court rejected plaintiff's claim that two law enforcement officers conspired against him with respect to racially discriminatory "profiling" because it was "uncontested that [the officer trained in profiling] acted only as an advisor in the investigation," and that the officer who secured and executed the warrant for a sample of plaintiff's DNA "*on his own,* drew up the warrant application for consideration," with the other officer "play[ing] no role in applying or executing the…warrant," thus not "*explicitly or implicitly* conspir[ing]…to deprive [plaintiff] of his constitutional rights." *Id.* at 1377 (emphasis in original).

---

[44] Plaintiff asserts that "Miller harassed the plaintiff while in Carroll County District Court…[by] arrest[ing] the plaintiff when he left the courthouse." *Id.* ¶ 144.

Similarly, no reasonable jury could find that, by advising Miller of the status of plaintiff's driver's license, Noma had a "meeting of the minds" with Miller to violate plaintiff's civil rights. Simply asserting that there was a conspiracy, in a "conclusory manner, in the absence of concrete supporting facts," is insufficient to withstand summary judgment. *Simmons,* 47 F.3d at 1377. Accordingly, Miller is entitled to summary judgment as to plaintiff's § 1985 claim.

### § 1986 Claim Against Tregoning

In Count 8, plaintiff has alleged a § 1986 claim against Tregoning. Section 1986 provides a cause of action against those in a position to prevent a conspiracy under § 1985, but who neglect to do so. "A cause of action based upon § 1986 is dependent upon the existence of a claim under § 1985." *Trerice v. Summons*, 755 F. 2d 1081, 1085 (4th Cir.1985). The failure of plaintiff's § 1985 claim against Miller precludes him from pursuing a § 1986 claim against Tregoning. Therefore, Tregoning is entitled to summary judgment as to Count 8.

### § 1981 And § 1982 Claims Against Tregoning and Miller

In Count 2, plaintiff has brought claims against Tregoning and Miller under 42 U.S.C. §§ 1981 and 1982. Section 1981 guarantees "[a]ll persons within the jurisdiction of the United States…the same right…to make and enforce contracts, to sue, be parties, give evidence, and [enjoy] the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." Section 1982 guarantees "[a]ll citizens of the United States…the same right…as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

Plaintiff has not alleged that Miller or Tregoning engaged in any conduct affecting plaintiff's right to contract, to sue, to be a party, or to give evidence. Nor is there any evidence that Miller or Tregoning engaged in any conduct that would inhibit plaintiff's ability to "inherit,

purchase, lease, sell, hold, and convey real and personal property."[45]   In the context of these claims, plaintiff complains only about Miller's arrest of plaintiff for driving on a suspended license.  Although plaintiff vaguely asserts that this arrest negatively affected his prospects as a businessman, his assertion is not supported by the record.

"Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends."  *U.S. v. Marion*, 404 U.S. 307, 320 (1971).  I am unaware of any authority that would countenance imposing liability under § 1981 or § 1982 against a law enforcement officer who made a lawful arrest under the theory that the collateral consequences of the arrest would be difficult or unpleasant for the arrestee.  Moreover, no reasonable jury could find in plaintiff's favor on these claims, as no evidence has been presented to support the claim.  Accordingly, Miller and Tregoning are entitled to summary judgment with respect to Count 8.

<u>Claims Against Miller For False Arrest, False Imprisonment, Malicious Prosecution,
And A Fourth Amendment Violation Under § 1983</u>

Plaintiff sued Miller under 42 U.S.C. § 1983, alleging the violation of his rights under the Fourth Amendment (Count 1).  He also brought tort claims against Miller for False Arrest, False Imprisonment, and Malicious Prosecution (Counts 10, 15, 16, 17, and 18).[46]  All of these claims

---

[45] To the extent that plaintiff asserts he was barred from the courts by his inability to pursue charges against Schwartz and Jeskey, these assertions clearly do not implicate Miller and Tregoning, who had no connection with the charging decisions of the SAO.  Nor does plaintiff assert that they had any such authority.

[46] With respect to tort claims, Maryland applies the principle of  *lex loci delicti*, i.e., the law of the place where the alleged harm occurred.  *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938); *Ben-Joseph v. Mt. Airy Auto Transporters, LLC,* 529 F. Supp. 2d 604, 606 (D. Md. 2008); *Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 726, 990 A.2d 1048, 1068 (2010).  Because the alleged harm occurred in Maryland, the Court will apply Maryland  law with respect to plaintiff's tort claims.  *See Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d

are predicated on Miller's arrest of plaintiff for driving on a suspended license.  Because Miller

had probable cause to arrest plaintiff for driving on a suspended license, and no reasonable jury

could find otherwise, Miller is entitled to summary judgment as to these counts.

"False imprisonment [and] false arrest…'can only occur when there is no legal authority

or justification for the arresting officer's actions.'" *Hines v. French*, 157 Md. App. 536, 551, 852

A.2d 1047, 1054 (2004) (citation omitted).  Probable cause is also a defense to analogous claims

brought under § 1983, alleging violation of the Fourth Amendment.  As the Fourth Circuit said in

*Harrison v. Deane*, 426 F. App'x 175, 181 (4th Cir. 2011), "there is no cause of action for 'false

arrest' under section 1983 unless the arresting officer lacked probable cause" (citation omitted).

And, "[f]alse arrest has the same elements as false imprisonment."  *Shiflett v. I.T.O. Corp. of

Baltimore*, No. 99-1379, 2000 WL 14214, at *4 n. 5 (4th Cir. Jan. 10, 2000).  *See also Rogers v.

Pendleton*, 249 F.3d 279, 294 (4th Cir. 2001) (stating that "false arrest and false imprisonment

claims…are essentially claims alleging a seizure of the person in violation of the Fourth

Amendment").

Probable cause is also a defense to claims of malicious prosecution.  The Maryland Court

of Appeals has said:

> To establish a cause of action for malicious prosecution, a plaintiff must prove
> that there was: '(a) a criminal proceeding instituted or continued by the defendant
> against the plaintiff, (b) termination of the proceeding in favor of the accused, **(c)
> absence of probable cause for the proceeding**, and (d) 'malice,' or a primary
> purpose in instituting the proceeding other than that of bringing an offender to
> justice.'

*Caldor, Inc.*, *supra*, 330 Md. at 656, 625 A.2d at 970 (citation omitted) (emphasis added).[47]

---

270, 275 (4th Cir. 2007) (stating that the court "must apply the substantive law of the forum state
including its choice of law rules)."

[47] To the extent that plaintiff seeks to bring a malicious prosecution claim under the
Fourth Amendment, "there is no such thing as a '§ 1983 malicious prosecution' claim…. It is

Probable cause is "'defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense.'" *Henderson v. Simms*, 223 F.3d 267, 271 (4th Cir. 2000) (quoting *Gerstein v. Pugh,* 420 U.S. 103, 111 (1975)). "While probable cause requires more than 'bare suspicion,' it requires less than that evidence necessary to convict. *United States v. Gray,* 137 F. 3d 765, 769 (4th Cir. 1998) (citation omitted). "In assessing whether probable causes exists, [a court] must examine the totality of the circumstances." *Wadkins v. Arnold*, 214 F.3d 535, 539 (4th Cir. 2000).

Under Maryland law, an individual with a suspended driver's license cannot "drive a motor vehicle on any highway." Md. Code (2009 Repl. Vol.), § 16-303(c) of the Transportation Article. Of import here, "[a] police officer may arrest without a warrant" a person the officer has probable cause to believe is "[d]riving or attempting to drive a motor vehicle while the driver's license or privilege to drive is suspended or revoked." *Id.* § 26-202(a); § 26-202(a)(3)(iv).

Miller avers in his Affidavit, and plaintiff does not dispute, that records maintained by the State of Maryland showed that, on March 24, 2010, plaintiff's driving privileges were suspended based upon his failure to pay child support. Yet, on that day, Miller observed plaintiff driving on Route 140. It is clear that, in his capacity as a Deputy Sheriff, Miller had probable cause to

---

not an independent cause of action." *Lambert v. Williams*, 223 F.3d 257, 262 (4th Cir. 2000) (citation omitted). A plaintiff can, however, bring "a claim founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution," *id.*: "a wrongful seizure and a termination in her favor of the proceedings following her seizure." *Snider v. Seung Lee*, 584 F.3d 193, 199 (4th Cir. 2009). Put another way,

> To prevail on a Fourth Amendment malicious prosecution claim under § 1983, a plaintiff must show that: (1) the defendant initiated or maintained a criminal proceeding; (2) the criminal proceeding terminated in the plaintiff's favor; **(3) the proceeding was not supported by probable cause**; and (4) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

*Id.* at 220 (J. Stamp, concurring) (emphasis added).

arrest plaintiff.  It is of no import that plaintiff's driving privileges were restored the next day because, at the time of the arrest, plaintiff had a suspended license, and was driving in full view of Miller.

Miller is clearly entitled to summary judgment on the claims plaintiff has brought against him under the Fourth Amendment and for False Arrest, False Imprisonment, and Malicious Prosecution under Maryland law (Counts 1, 10, 15, 16, 17, and 18).

<u>Remaining § 1983 Claims Against Miller</u>

In Counts 1, 2, and 20, plaintiff has lodged several additional claims against Miller under 42 U.S.C. § 1983.  Count 2 asserts that Miller violated plaintiff's rights under the Fourteenth Amendment's Equal Protection Clause.  However, it is difficult to ascertain exactly how or why plaintiff believes that Miller violated his Fourteenth Amendment rights; plaintiff does not allege that Miller engaged in any conduct that discriminated against plaintiff because he is African American, or that Miller treated plaintiff differently than similarly situated Caucasians.  Although plaintiff's Complaint is replete with accusations of racial discrimination, plaintiff claims that Miller acted not out of racial animus, but in retaliation for plaintiff's "speaking out" about the perceived injuries inflicted upon him by the various government actors named in this case.  Complaint ¶ 96.  Miller is, accordingly, entitled to summary judgment on Count 2.

Plaintiff's speech-related claims are articulated in Counts 1 and 20.  In Count 1, plaintiff alleges that Miller "violated his 1st amendment rights in retaliation for speaking out against those in power and for writing BLOGS demonstrating the injustices perpetrated against him." *Id.* ¶ 96. Count 20 asserts that Miller "initiated a retaliatory prosecution against the Plaintiff…without probable cause," *id.* ¶ 208, "because the Plaintiff chose to exercise his constitutional rights to express his dissatisfaction with the racist treatment he received." *Id.* ¶ 210.

"Arresting a person solely based on speech that questions or opposes police action violates the First Amendment." *Lowe v. Spears*, 258 F. App'x 568, 570 (4th Cir. 2007). However, plaintiff has not articulated any facts, nor is there evidence in the record, that would support an inference that Miller's arrest of plaintiff in March 2010 was effectuated to punish plaintiff for the exercise of his First Amendment rights. To the contrary, in his sworn affidavit, Miller avers that plaintiff was arrested because he was driving on a suspended license.

To be sure, Oesterreicher confirms that, in preparation for plaintiff's 2010 assault trial, she "used some of [plaintiff's] MySpace blogs that [she] had printed off to cross examine [plaintiff]." State Motion Exh. 4, Oesterreicher Decl. at 2 ¶ 2. But, plaintiff does not allege that Miller himself was aware of plaintiff's "BLOGS." Plaintiff also concedes that, on the day he was arrested, there were two other men sharing a cell with him who were also arrested for driving on licenses that had been suspended due to failure to pay child support. Opposition To Sheriffs at 7. Plaintiff does not allege that these other men were unlawfully targeted. In my view, no reasonable jury could find that Miller's arrest of plaintiff was motivated by a speech-related retaliatory purpose. Miller is entitled to summary judgment as to Counts 1 and 20.

Further, Miller is protected by the doctrine of qualified immunity. Under that doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). *See also Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (*en banc*) ("Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful"), *cert. denied*, ___U.S.___, No. 11–458, 2011 WL 4853873 (Nov. 28, 2011). Qualified immunity

ensures that "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Iko v. Shreve,* 535 F.3d 225, 238 (4th Cir. 2008).

In determining whether an officer is entitled to qualified immunity, courts have engaged in a two-pronged analysis, announced in *Saucier v. Katz,* 533 U.S. 194 (2001).  First, the court must determine whether a constitutional right has been violated.  Second, "assuming that the violation of the right is established, courts must consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right."  *Brown v. Gilmore,* 278 F.3d 362, 367 (4th Cir. 2002) (citing *Saucier*, 533 U.S. 194).[48]  Put another way, the court must determine whether "[t]he contours of" a plaintiff's asserted right were "sufficiently clear that a reasonable official would understand that what he is doing violates that right," *i.e.,* whether "in the light of pre-existing law the unlawfulness" of "an official action is...apparent." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). *See also Wilson v. Layne,* 526 U.S. 603, 615 (1999) (defining the inquiry as to "whether a reasonable officer could have believed that [his actions were] lawful, in light of clearly established law and the information [he] possessed").

To my knowledge, there has been no clear directive from the Fourth Circuit indicating that an arrest based on probable cause would necessarily violate a plaintiff's First Amendment rights if it was motivated by or intended as retaliation for the plaintiff's exercise of rights under

---

[48] The United States Supreme Court has held that "[t]he judges of the district courts and courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan,* 555 U.S. 223, 236 (2009). *See also Purnell,* 652 F. 3d at 531 (recognizing a court's right to "'exercise…discretion'" in choosing which *Saucier* prong to address first) (quoting *Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010)).

the First Amendment.   The Fourth Circuit has stated that "the presence of probable cause forecloses relief on all…federal and state constitutional and tort claims based on the arrest, the search and the prosecution at issue."   *Bruette v. Montgomery County, Maryland*, 70 F. App'x 88, 95 (4th Cir. 2003).   *See also Smith v. McCluskey*, 126 F. App'x 89, 95 (4th Cir. 2005) (Gregory, J., concurring) (stating that "the existence of probable cause to arrest…is fatal to…First and Fourth Amendment claims)."

This Spring, the United States Supreme Court will consider whether the existence of probable cause to arrest bars a First Amendment retaliatory arrest claim.   *See Reichle v. Howards*, No. 11-262, 2011 WL 3812626 (Dec. 5, 2011).   "A decision on the underlying constitutional question in a § 1983 damages action or a *Bivens* action may have scant value when it appears that the question will soon be decided by a higher court."   *Pearson,* 555 U.S. at 237-38 (internal citation omitted).   For this reason, I will not address the first prong under *Saucier.*   As the Ninth Circuit explained in *Motley v. Parks*, 432 F.3d 1072, 1078 (9th Cir. 2005):

> The Supreme Court has granted certiorari…on the precise issue involved in this case.   Thus, the very justification for *Saucier's* first step is inapplicable; avoiding the constitutional question will not impede the elaboration of constitutional principles, and answering the constitutional question would foster neither certainty nor finality….   In this unusual circumstance, we bypass *Saucier's* first step and decide only whether [the right] was clearly established at the time of the search that the officers needed some suspicion of wrongdoing.

Clearly, the second *Saucier* prong has not been met here.   Even assuming, *arguendo*, that Miller acted with the retaliatory motive that plaintiff ascribes to him, Miller did not violate a clearly established constitutional right.   This is evidenced by the fact that there is no clear directive from the Fourth Circuit, and the Supreme Court is set to address the issue in the Spring.   Accordingly, Miller is protected by qualified immunity.

<u>Maryland Constitutional Claims Against Miller</u>

In Count 9, plaintiff brings a number of claims against Miller under Articles 19, 21, 24, 26, and 40 of the Maryland Declaration of Rights.  He asserts that Miller "retaliated against the plaintiff for speaking out regarding the racist policies and customs enacted by the County, the State and the herein named agents/employees by arresting him on March 24, 2010, without legal justification and demonstrating deliberate indifference to his Maryland Constitutional Rights…." Complaint ¶ 159; *see also id.* ¶¶ 151, 154.

Article 21 is "the Maryland analogue to the Sixth Amendment."  *Perry v. State*, 357 Md. 37, 78, 741 A. 2d 1162, 1184 (1999).  Plaintiff's Article 21 claim pertains to the allegation that "Defendants deprived the Plaintiff of having witnesses testify on his behalf…as described herein during 2 criminal prosecutions (Alleged Assault Trial (FEB 2010) and Fraud/PO Trial (JAN 2010)."  *Id.* ¶ 161.  This allegation clearly does not implicate Miller, as he did not interact with plaintiff until March 2010, *i.e.*, after the trial dates for the assault, fraud, and domestic violence charges.  Miller is entitled to summary judgment on the Article 21 claim.

Plaintiff articulates the thrust of his claims under both Article 19 and Article 24, asserting that the defendants' refusal "to accept charging documents filed by him…inhibit[ed] his ability to…be heard by a jury of his peers…in direct violation of his due process rights in violation of Articles 19 and 24 of the Maryland Declaration of Rights."  *Id.* ¶ 163.

Article 19 provides: "That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land…."  It is intended to ensure "access to courts."  *Franklin v. Mazda Motor Corp.*, 704 F. Supp. 1325, 1327 (D. Md. 1989).  Article 24 states: "That no man ought to be taken or imprisoned or disseized of his freehold,

liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." Article 24 "is *in pari materia* with the Due Process Clause of the Fourteenth Amendment." *Doe v. Department of Public Safety and Correctional Services*, 185 Md. App. 625, 636, 971 A. 2d 975, 982 (2009).

As to the Article 19 claim, the allegations of ¶ 163 of the Complaint clearly do not implicate Miller; he played no part in deciding whether to charge Schwartz or Jeskey pursuant to plaintiff's request. It follows that Miller had no impact on plaintiff's "access to courts," and Miller is entitled to summary judgment with respect to the Article 19 claim.

With respect to the Article 24 claim, plaintiff complains only about Miller's alleged unlawful seizure of plaintiff. Claims of unlawful seizure implicate the Fourth Amendment, but not the Fourteenth Amendment Due Process Clause, or its Maryland analogue, Article 24. *Taylor v. Waters*, 81 F.3d 429, 435-36 (4th Cir. 1996) ("The Fourth Amendment…define[s] the process that is due for seizures of person or property in criminal cases….[N]o substantive due process right against prosecution on less than probable cause exists under the Fourteenth Amendment….") (citation and internal quotation marks omitted). *See also Brooks v. City of Winston-Salem*, 85 F.3d 178, 184 (4th Cir. 1996) ("[Plaintiff] charges that [the Officer's] failure to…terminate the criminal proceedings after it became clear that [plaintiff] was innocent deprived him of his constitutional rights under the Fourth and Fourteenth Amendments….[T]he Due Process Clause of the Fourteenth Amendment does not provide protection in this area") (citations omitted).

As to plaintiff's Article 26 claim, "the cases are legion in which Maryland Courts have construed Article 26 *in pari materia* with the Fourth Amendment to the United States

Constitution." *Padilla v. State*, 180 Md. App. 210, 226, 949 A.2d 68, 78 (2008). *See, e.g., Parker v. State*, 402 Md. 372, 400, 936 A.2d 862, 878 (2007); *Patterson v. State*, 401 Md. 76, 113, 930 A.2d 348, 372 (2007); *Byndloss v. State*, 391 Md. 462, 465 n.1, 893 A.2d 1119, 1121 n.1 (2006); *Davis v. State*, 383 Md. 394, 408, 859 A.2d 1112, 1120 (2004); *Scott v. State*, 366 Md. 121, 139, 782 A.2d 862, 873 (2001); *Richardson v. McGriff*, 361 Md. 437, 452-53, 762 A.2d 48, 56 (2000); *Purnell v. State*, 171 Md. App. 582, 607, 911 A.2d 867, 882 (2006), *cert. denied*, 398 Md. 315, 920 A.2d 1060 (2007). Notably, Article 26 "'does not accord appellant any greater protection than the Fourth Amendment to the United States Constitution.'" *Blasi v. State*, 167 Md. App. 483, 511 n. 12, 893 A.2d 1152, 1168 n. 12 (2006) (citation omitted), *cert. denied*, 393 Md. 325, 900 A.2d 751 (2007). Moreover, "decisions of the Supreme Court interpreting the Fourth Amendment are entitled to great respect in construing Article 26." *Gadson v. State*, 341 Md. 1, 8 n. 3, 668 A.2d 22, 26 n. 3 (1995).

As discussed, plaintiff cannot sustain a Fourth Amendment claim against Miller. This is because Miller had probable cause to arrest him. Accordingly, Miller is entitled to summary judgment as to the claim brought under Article 26.

Plaintiff has also alleged a violation of Article 40, which is construed "*in pari materia* with the First Amendment." *Howard County Citizens for Open Government v. Howard County Bd. of Elections*, 201 Md. App. 605, 623 n. 19, 30 A.3d 245, 257 n. 19 (2011). However, "simply because a Maryland constitutional provision is *in pari materia* with a federal one or has a federal counterpart, does not mean that the provision will always be interpreted or applied in the same manner as its federal counterpart." *Dua v. Comcast Cable,* 370 Md. 604, 621, 805 A.2d 1061 (2002). With respect to the Article 40 claim, Maryland courts *might* be more hospitable than the federal courts to a speech claim such as Strickland's. Without any analysis, plaintiff

cites one sentence of a lengthy decision of the Maryland Court of Special Appeals, issued in

connection with a fact-intensive matter that is factually distinct from this one.  There, the court

said that, "even if [an] arrest were supported by probable cause, this would not foreclose a

constitutional claim based on a free speech violation." *Davis v. DiPino*, 121 Md. App. 28, 61,

708 A.2d 357, 373 (1998), *aff'd in part, rev'd in part on other grounds*, 354 Md. 18, 729 A.2d

354 (1999) (recognizing, at 354 Md. at 54, 729 A.2d at 373, a First Amendment right to verbally

oppose or challenge police action, but not without limitations).  However, plaintiff has not set

forth any facts or evidence that would support an inference that his arrest was effectuated to

punish him for his First Amendment activities, rather than because he was driving on a

suspended license.

Moreover, as defendants contend, Sheriffs' Memo at 24, Miller is protected by statutory

immunity.  "Maryland officials are granted immunity under the Maryland Tort Claims Act

("MTCA")…for state constitutional violations committed within the scope of their duties when

the violations are made 'without malice or gross negligence.'" *Purnell*, 652 F.3d at 536.  *See

also Lee v. Cline*, 384 Md. 245, 266, 863 A.2d 297, 310 (2004) ("immunity under the Maryland

Tort Claims Act…encompasses constitutional torts and intentional torts").  A "sheriff or deputy

sheriff of a county" is an official within the ambit of this immunity.  Md. Code (2009 Repl. Vol.)

§ 12-101(a)(6) of the State Government Article.  They "are immune from suit in the courts of the

State and from liability in tort for a tortious act or omission that is within the scope of the[ir]

public duties…and is made without malice or gross negligence…."  Md. Code (2006 Repl. Vol.)

§ 5-522(b) of the Courts and Judicial Proceedings Article.  The "scope of public duties" is the

equivalent of the common law concept of "scope of employment."  *Sawyer v. Humphries*, 322

Md. 247, 254, 587 A.2d 467, 470 (1991); *see Larsen v. Chinwuba*, 377 Md. 92, 109, 832 A.2d

193, 202 (2003) (stating that conduct is within the scope of employment if it was "incident to the performance of the duties entrusted" to the employee).  It is undisputed that Miller was acting within the scope of his employment as a Deputy Sheriff when he arrested plaintiff.

Plaintiff alleges in Count 9 that defendants, including Miller, acted "intentionally and with malice."  Complaint ¶ 150.  To act with malice, an official must engage in "conduct 'characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill will or fraud....'"  *Shoemaker v. Smith*, 353 Md. 143, 163, 725 A.2d 549, 559 (1999) (quoting *Montgomery Ward v. Wilson*, 339 Md. 701, 728 n. 5, 664 A.2d 916, 929 n. 5 (1995)).  "Merely asserting that an act was done maliciously, or without just cause, or illegally, or with wanton disregard, or recklessly, or for improper motive does not suffice.  To overcome a motion raising governmental immunity, the plaintiff must allege with some clarity and precision those facts which make the act malicious."  *Elliott v. Kupferman*, 58 Md. App. 510, 528, 473 A.2d 960, 969 (1984).  *Accord Green v. Brooks*, 125 Md. App. 349, 725 A.2d 596 (1999); *see also Swagler v. Harford County*, No. RDB-08-2289, 2010 WL 1923766, at *3-5 (D. Md. May 10, 2010); *Hovatter v. Widdowson*, No. CCB-03-2904, 2004 WL 2075467, at *7 (D. Md. Sept. 15, 2004) ("bare legal conclusions [of malice] are not binding on the court").

In his sworn statement, Miller avers that he arrested plaintiff because he had observed plaintiff violate the law by driving without a valid license.  Even assuming, *arguendo*, that Miller laughed when he arrested plaintiff, such conduct does not amount to malice, as defined above, so as to deprive Miller of the protections of the MTCA.  *Compare Barbre v. Pope*, 402 Md. 157, 186, 935 A.2d 699, 716 (2007) (finding malice based on the shooting of a citizen whose arms

were raised in surrender).[49]   Clearly, plaintiff's arrest was not "without just cause," or "illegal"; it

was made upon probable cause.  *Elliott*, 58 Md. App. At 528, 473 A.2d at 969.   There is also no

evidence that Miller possessed an "evil or wrongful motive."  *Shoemaker,* 353 Md. at 163, 725

A.2d at 559; *Elliott*, 58 Md. App. At 528, 473 A.2d at 969.   As discussed, *supra*, no reasonable

jury could find that Miller's arrest of plaintiff was motivated by an improper, retaliatory purpose.

Miller is entitled to summary judgment on all the "State Constitutional Claims" (Count 9) that

plaintiff has brought against him.

### § 1983 Claims Against Tregoning

In Counts 1, 2, and 5, plaintiff has alleged § 1983 claims against Tregoning.  Defendants

observe:

> Strickland does not allege that Sheriff Tregoning personally engaged in any
> conduct that violated his rights.  In fact, Sheriff Tregoning's name appears in only
> one (1) of the seventy-two (72) numbered factual averments in the Amended
> Complaint.  Strickland alleges only that Sheriff Tregoning 'negligently supervised
> his deputies....'

Sheriffs' Memo at 7 (citation omitted).

"[L]iability under § 1983 is conditioned on a showing of some personal involvement or

participation in the denial of civil rights."  *McAdoo v. Toll*, 591 F. Supp. 1399, 1404 (4th Cir.

1984).   "In a § 1983 suit…masters do not answer for the torts of their servants—the term

'supervisory liability' is a misnomer.  Absent vicarious liability, each Government official, his or

her title notwithstanding, is only liable for his or her own misconduct."  *Ashcroft v. Iqbal*, 556

U.S. 662, ___, 129 S.Ct. 1937, 1949 (2009).

Plaintiff does not address this issue in his Opposition or in his Surreply.  *See Mentch v.

Eastern Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (holding that failure to address

---

[49] Plaintiff's allegation that, as he was arrested, he also observed Schwartz drive by,
"laughing," is of no import with respect to claims against *Miller*.

defendant's arguments for summary judgment in opposition brief constituted abandonment of claim).  In my view, defendants' arguments are meritorious, and plaintiff has waived his right to recover.  Tregoning is entitled to summary judgment on Counts 1, 2, and 5.

<u>Defamation And Invasion of Privacy—False Light Claim Against Miller</u>

In Count 21, plaintiff alleges "Defamation and Invasion of Privacy—False Light" against Miller, as well as other defendants.

In Maryland, to establish a defamation claim, a plaintiff must show:

(1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm.

*Offen v. Brenner*, 402 Md. 191, 198-99, 935 A.2d 719, 723-24 (2007).

To establish a claim in Maryland for "the tort of false light invasion of privacy," a plaintiff must show that a defendant has

give[n] publicity to a matter concerning another that places the other before the public in a false light…if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Chinwuba v. Larsen*, 142 Md. App. 327, 359 n. 8, 790 A.2d 83, 102 n. 8 (2002), *rev'd on other grounds,* 377 Md. 92, 832 A. 2d 193 (2003).  *See Furman v. Sheppard,* 130 Md. App. 67, 77, 744 A.2d 583, 587 (2000); *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 514, 665 A.2d 297, 318 (1995), *cert. denied* 341 Md. 172, 669 A.2d 1360 (1996); *see also Holt v. Camus*, 128 F. Supp. 2d 812, 816 (D. Md. 1999).

Plaintiff alleges that the defendants, including Miller, "publicized…false criminal charges to the Plaintiff's customer, NSA and in other public media forums when they knew or should have known they were false and there was no probable cause or credible evidence to

support their actions." Complaint ¶ 36. Further, he asserts that "the fact that DFC Miller arrested the Plaintiff on March 24, 2010 was publicized on the Internet by…Schwartz, and by the rest of the white citizens…[defendants] continue to protect…." *Id.* ¶ 216.[50]

These assertions are not borne out by plaintiff's own statement of the facts, or the rest of the voluminous record. Nowhere does plaintiff assert that, with respect to plaintiff's arrest for driving on a suspended license, Miller made *any* statements to NSA or in "public media forums." To the extent that statements were made by Schwartz or other private citizens, Miller is not liable for them. Because no reasonable jury could find that Miller made "a defamatory statement" or gave "publicity" to a matter concerning plaintiff, Miller is entitled to summary judgment on the claim for "Defamation & Invasion Of Privacy—False Light."

<u>Claims Against Miller For Tortious Interference With Prospective Advantage And
Intentional Interference With A Business Relationship</u>

In Counts 11 and 12, plaintiff asserts claims against Miller for "Tortious Interference With Prospective Advantage" and "Intentional Interference With A Business Relationship." In Maryland, "tortious interference with prospective advantage" and "intentional interference with a business relationship" are but two names for one tort. *See havePOWER, LLC v. General Electric Co.*, 183 F.Supp.2d 779, 785 (D. Md. 2002) (noting that the tort of tortious interference with prospective advantage "has come to be known" as "tortious interference with business relationships). Therefore, I will analyze Counts 11 and 12 together.

To prevail, plaintiff must prove that Miller committed:

(1) intentional and willful acts; (2) calculated to cause damage to the plaintiff in [his] lawful business; (3) done with the unlawful purpose to cause such damage

---

[50] Plaintiff identifies the other "white citizens" as "Jeskey, Thorn [and] Skinner." *Id.* "Thorn" and "Skinner" do not otherwise appear in the record, and it is unclear to whom plaintiff is referring.

and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.

*Carter v. Aramark Sports and Entertainment Services, Inc*., 153 Md. App. 210, 240, 835 A.2d 262, 279-80 (2003) (internal quotation marks and citation omitted).

Plaintiff maintains that that "defendants" made "untrue statements to the National Security Agency" that were "willful, intentional, and calculated to damage the Plaintiff's lawful business." Complaint ¶ 172.   He also claims: "Defendants intentionally filed untrue criminal charges against the plaintiff, without probable cause, in an effort to interfere with his lawful business relationships." *Id.* ¶ 179.   As noted, however, plaintiff does not assert that Miller ever communicated with NSA.   In fact, plaintiff's relationship with NSA was terminated in July 2009, months before Miller arrested plaintiff in March 2010.   *See* Complaint ¶ 29.   And, as discussed, Miller had probable cause to arrest plaintiff for driving on a suspended license.

In an attempt to salvage his claim against Miller, plaintiff asserts: "Whether…[Miller] spoke with investigators *directly* is beside the point."   Opposition to Sheriffs at 14 (emphasis added).   He argues that Miller "*indirectly*" spoke to "federal investigative officers," *id.* at 15 (emphasis added), "because those investigators check Maryland State Records when performing background investigations," and would, when performing such investigations, discover that plaintiff had been arrested by Miller.   *Id.*   In plaintiff's view, the discovery of plaintiff's arrest would be the equivalent of Miller "t[elling] the investigators that he arrested the plaintiff…," *id.,* thus fulfilling Miller's alleged goal of "caus[ing] damage to the plaintiff's business interests." *Id.* at 14.   Plaintiff asserts, *id.*: "It is elementary that having a criminal record and continuous 'run-ins' with the law can negatively affect a citizen with a 'regular job' let alone someone with a Top Secret Security clearance."

I am unaware of any authority that would attach liability for these torts to a law enforcement officer who made a lawful arrest, merely because an employer or prospective employer one day might learn of the arrest, with adverse consequences to the arrestee's job status.

In *Bruette v. Montgomery County, Maryland*, 70 F. App'x 88 (4th Cir. 2003), the Fourth Circuit reviewed the disposition of a claim for tortious interference with a business relationship brought by plaintiffs whose employer was informed that plaintiffs were embroiled in an investigation for child pornography and asked whether "their computers at work contained evidence of child pornography.  [The investigating officer] also informed [the employer] of the arrests which, at the time, were matters of public record."  *Id*. at 96.  Plaintiffs were terminated. The Fourth Circuit affirmed the grant of summary judgment to defendants as to the claim of tortious interference with a business relationship, stating: "Whatever else may be said about [the officer's] conduct, however, we can find nothing in it on which a reasonable jury could base a finding that his communications with [the employer] were accomplished with the purpose of causing damage to a business relationship."  *Id.*

There is no evidence in the record that would suggest that Miller arrested plaintiff "to cause damage to the plaintiff in his lawful business," or that the arrest actually damaged plaintiff's business.  No reasonable jury could so find, and Miller is entitled to summary judgment on Counts 11 and 12.

<u>Claims Against Miller And Tregoning For<br>Intentional Infliction Of Emotional Distress ("IIED")</u>

Count 19 alleges a claim of "Intentional Infliction Of Emotional Distress" against Miller and Tregoning.  In order to prevail in Maryland on a claim for the tort of intentional infliction of emotional distress, a plaintiff must show:

1) the defendant's conduct was intentional or reckless; 2) his conduct was extreme and outrageous; 3) there was a causal connection between the defendant's wrongful conduct and the emotional distress suffered; and 4) the emotional distress was severe.

*Borchers v. Hrychuk,* 126 Md. App. 10, 18, 727 A.2d 388, 392 (1999).

Notably, "[e]ach of [the] elements must be pled and proved with specificity. It is not enough for a plaintiff merely to allege that they exist; he must set forth facts that, if true, would suffice to demonstrate that they exist." *Foor v. Juvenile Serv. Admin.,* 78 Md. App. 151, 175, 552 A.2d 947, 959 (1989). Moreover, claims for intentional infliction of emotional distress are disfavored and difficult to establish and, as such, are "rarely viable." *Farasat v. Paulikas,* 32 F. Supp. 2d 244, 247 (D. Md. 1997).

For conduct to be considered "intentional or reckless," a plaintiff "must allege and prove that the defendant either *desired* to inflict severe emotional distress, *knew* that such distress was *certain or substantially certain* to result from his conduct, or acted recklessly in deliberate disregard *of a high degree of probability* that the emotional distress will follow." *Foor*, 78 Md. App. at 175, 552 A.2d at 959 (emphasis in original). Moreover, "[t]he 'extreme and outrageous' standard is quite high." *Respess v. Travelers Cas. & Sur. Co. of America*, 770 F. Supp. 2d 751, 758 (D. Md. 2011). As the Maryland Court of Appeals said in *Kentucky Fried Chicken National Management Co. v. Weathersby,* 326 Md. 663, 670, 607 A.2d 8, 11 (1992), the tort is used "only for opprobrious behavior" involving "truly outrageous conduct." In particular, the defendants' conduct must be "'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'" *Farasat,* 32 F. Supp. 2d at 247 (internal citation omitted). Put another way, "[t]o be actionable, the conduct relied upon 'must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.'" *Id.* at 248 (quoting *Hamilton v.*

*Ford Motor Credit Co.,* 66 Md. App. 46, 59-60, 502 A.2d 1057, 1064, *cert. denied,* 306 Md. 118, 507 A.2d 631 (1986)).

As to the requisite severity, "a plaintiff must show that the distress inflicted was 'so severe that no reasonable [person] could be expected to endure it.'" *Lauture v. St. Agnes Hosp.*, No. 08-943, 2009 WL 5166253, at *12 (D. Md. Dec. 29, 2009) (internal citation omitted). *See also Tackacs v. Fiore,* 473 F. Supp. 2d 647, 652 (D. Md. 2007) (stating that the emotional distress must be so severe as to have disrupted a plaintiff's "'ability to function on a daily basis'" (internal citation omitted)). Stated differently, the "balm" of recovery is to be "'reserved for those wounds that are truly severe and incapable of healing themselves.'" *Figueiredo-Torres v. Nickel,* 321 Md. 642, 653, 584 A.2d 69, 75 (1991) (internal citation omitted).

Here, plaintiff merely posits, without citing any authority, that "unlawful seizures can support a cause for IIED," that defendants "illegally jailed the Plaintiff…without probable cause,"[51] and that defendants' conduct was "heinous, unlawful, and [caused] the Plaintiff severe emotional distress," for which "Plaintiff would seek medical assistance, if he could afford to do so." Complaint ¶¶ 203-05.

No reasonable jury could find that plaintiff was the victim of intentional infliction of emotional distress. As Miller lawfully arrested plaintiff for driving on a suspended license, based on probable cause, the arrest did not constitute "extreme and outrageous" conduct. This is so even if Miller did "laugh" as he arrested plaintiff.[52] *See, e.g.*, *Tavakoli-Nouri v. State*, 139 Md. App. 716, 779 A.2d 992 (2001) (rejecting contention of extreme and outrageous behavior as

---

[51] Plaintiff states that he was "illegally jailed" on "two occasions." Complaint ¶ 204. Only the arrest by Miller is relevant to the discussion of plaintiff's claims against Miller and Tregoning.

[52] Plaintiff was arrested shortly after leaving the courthouse, where he concedes he had been in order to attend to a matter involving Schwartz. Hence, Schwartz's presence in the vicinity of the scene is not surprising.

to five officers who dragged plaintiff, in handcuffs, through a government building and subjected him to aggressive questioning based on unfounded accusations); *Branch v. McGeeney*, 123 Md. App. 330, 718 A.2d 631 (1998) (in case involving claims under 42 U.S.C. § 1983, the Maryland Constitution, and claims for false arrest, false imprisonment, malicious prosecution, and intentional infliction of emotional distress, concluding that it was not extreme and outrageous for police officers to handcuff a nine-year-old girl, force her to her knees, and arrest her after she refused to stop throwing acorns at an apartment building).

Finally, there is no evidence in the record that would suggest plaintiff suffered emotional distress, beyond that which an ordinary person could be expected to bear, or of such a severity that it affected his "ability to function on a daily basis." *Tackacs,* 473 F. Supp. 2d at 652 (internal quotation marks omitted). Indeed, plaintiff has not mustered any such evidence. Instead, he merely asks, rhetorically: "Can there be a doubt that the described circumstances would place someone in 'severe emotional distress'?" Opposition to County at 20.[53] Consequently, no reasonable jury could conclude that plaintiff suffered emotional distress at the requisite level of severity. *See, e.g., Kashaka v. Baltimore County, Maryland*, 450 F. Supp. 2d 610, 620 (D. Md. 2006) (stating, in granting defendants' motion for summary judgment with respect to a claim for IIED: "Plaintiffs claim only that they have suffered humiliation, loss of income, damage to their reputation, and familial tensions and frictions. They do not offer any proof as to the nature, intensity, or duration of their trauma."); *Farasat,* 32 F.Supp.2d at 248 (stating, in granting defendants' motion to dismiss with respect to a claim for intentional infliction of emotional distress, that "plaintiff has done no more than conclusorily allege that he

---

[53] In his Opposition to Sheriffs, at 16, plaintiff states that, with respect to the IIED claim against Miller and Tregoning, the Opposition to County "is included by reference as if it were fully set forth herein."

suffered 'severe emotional distress' and 'mental anguish.'…There are no allegations in the amended complaint that plaintiff was ever treated by a physician for his mental anguish, that he was ever hospitalized because of a severely disabling emotional condition, that he lost sleep or weight, or that he was unable subsequently to live a normal life.").

In sum, no reasonable jury could find that Miller's conduct was intentional or reckless, extreme and outrageous, or that plaintiff suffered emotional distress of a severity justifying relief.  Similarly, plaintiff has not alleged any actionable conduct by Tregoning.  Accordingly, both Miller and Tregoning are entitled to summary judgment with respect to the claim for intentional infliction of emotional distress.

### "Negligence & Gross Negligence" Claim Against Miller

Count 13 sets forth plaintiff's claim of "Negligence & Gross Negligence" against Miller. Plaintiff alleges that Miller "breached a duty…to not file false criminal charges against him by evidence fabrication and suborning perjury" and "by performing negligent investigations regarding alleged criminal conduct supposedly perpetrated by the Plaintiff which caused plaintiff's security clearances to be revoked[,] rendering him unable to earn a living."  Complaint ¶¶ 182-83.  Yet, neither the facts as alleged by plaintiff nor the parties' submissions implicate Miller in any of the conduct complained of in Count 13.  Nowhere does plaintiff allege that Miller fabricated evidence or suborned perjury.  And, plaintiff's security clearance was, as discussed, revoked in July 2009, Complaint ¶ 29, months before he was arrested by Miller in March 2010.  Because Miller was not part of any "negligent investigation" that supposedly led to the revocation, he is entitled to summary judgment as to Count 13.

<u>Negligent Supervision Claim Against Tregoning</u>

Count 14 contains plaintiff's "Negligent Supervision" claim against Tregoning.  Plaintiff asserts that Tregoning did not take "reasonable care in ensuring [his] employees/agents were fit and reliable," "neglected to ensure employees within [his] charge were aware of or received training regarding actions that offend the US and MD State Constitutions and common law," and "displayed a deliberate indifference to the rights and privileges afforded to the plaintiff by the United States and MD Constitutions."  Complaint ¶¶ 188-91.

In order to prevail on a claim for negligent supervision, plaintiff must prove:

(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in…[supervising]…the employee as the proximate cause of plaintiff's injuries.

*Latty v. St. Joseph's Soc. of Sacred Heart, Inc.*, 198 Md. App. 254, 272, 17 A.3d 155, 165 (2011) (citing *State v. Jones*, 197 Md. App. 638, 658, 14 A.3d 1223, 1235 (2011)); *see also Cramer v. Hous. Opportunities Comm'n of Montgomery Cnty.*, 304 Md. 705, 712, 501 A.2d 35, 39 (1985).

Plaintiff's claims against Tregoning are premised solely on his status as Miller's supervisor.  Plaintiff has not complained of Tregoning's conduct or omissions.  Rather, he has asserted, in essence, that because Miller was both a wrongdoer and Tregoning's inferior, Tregoning must be responsible.  But, none of plaintiff's claims against Miller have survived summary judgment.  "[W]hen underlying torts fail as a matter of law, vicarious liability is of no worth."  *Bond v. Rexel, Inc.*, No. 5:09–CV–122, 2011 WL 1578502, *9 (W.D.N.C. Apr. 26, 2011).  Thus, Tregoning is entitled to summary judgment on the negligent supervision claim.

*Claims Against Carroll County, Maryland*

Carroll County states in its Memo, at 5 (citations omitted):

Strickland's claims against the County are based upon three fundamental premises. First, that the individual defendants, who are all elected official[s] or employees of the State's Attorney's Office or the Sheriff's Office, were employees or agents of the County. Second, that the County can be held liable for the alleged customs and polices [they] implemented.... Third, that [they] are final policy makers for the County.

As the County observes, plaintiff's theory of liability with respect to the County rests wholly on his assumption that the County is liable for the acts of the individual defendants. However, none of the individual defendants are employees or agents of the County; the County is not liable for customs or policies implemented by those defendants; and the employees of the State's Attorney's Office and the Sheriff's Office are not final policymakers for the County.[54] Therefore, the County is entitled to summary judgment.

The individual defendants are all employees of the Carroll County State's Attorney's Office or the Carroll County Sheriff's Office. Under Maryland's Constitution, each county sheriff is a constitutional officer. *See* Md. Const., Art. 4, § 44. Under Maryland law, as a general rule, county sheriffs and their deputies are "officials and/or employees of the State of Maryland," rather than the county where they work. *Rucker v. Harford County*, 316 Md. 275, 281, 558 A.2d 399, 402 (1989). However, "a sheriff may...be treated as a local government

---

[54] To the extent that plaintiff's Complaint could be construed as alleging harm caused by the district court commissioners, it should be noted that district court commissioners are not regarded as County employees, either. They are appointed by the administrative judge of each district and are considered "judicial officers." *DeWolfe v. Richmond*, No. 34, 2012 WL 10853, *1 (Md. Jan. 4, 2012); *D'Aoust v. Diamond*, 197 Md. App. 195, 207, 13 A.3d 43, 50 (2010); *Rice v. Dunn,* 81 Md. App. 510, 568 A. 2d 1125, 1128 (1990). *See also* Md. Rule 4-102(f) ("'Judicial officer' means a judge or District Court commissioner."); Md. Code (2006 Repl. Vol.) § 2-607(a)(1) of the Courts & Judicial Proceedings Article ("C.J.P.") ("The administrative judge of each district...may appoint the number of commissioners required in the county and as to the persons to be appointed).

employee" for issues involving "local funding of sheriff's offices" or a sheriff's entitlement to local government employee benefits. *Id.* at 289, 558 A.2d at 406.

Similarly, under the Maryland Constitution, the State's Attorney for each county and Baltimore City is a constitutional officer. *See* Md. Const., Art. 5, § 7.  It has been "squarely [held] that the State's Attorney is a state official under Maryland law." *Lowery v. Prince George's County, Md.*, 960 F.Supp. 952, 956 (D. Md. 1997) (citing *Valle v. Pressman*, 229 Md. 591, 599, 185 A.2d 368, 374 (1962) ("a State's Attorney is a State rather than a local officer")).

The Maryland Court of Appeals has suggested that, although employees of a State's Attorney's office "[a]re state employees," a county may be a joint employer for the purpose of disputes over payment, such as claims brought under the Fair Labor Standards Act (FLSA) or Maryland Wage and Hour Law (MWHL).  *Newell v. Runnels*, 407 Md. 578, 649, 967 A.2d 729, 771 (2009).  This stems from the counties' responsibility for funding, rather than their functional duties as "employers," and due to statutory language in wage laws, which are typically "not limited by the common law concept of 'employer,' and [are] given an expansive interpretation in order to effectuate…broad remedial purposes." *Id.* at 649-54, 967 A.2d at 771-74.

To be sure, the County is required to provide financial support, office space, equipment, and support services to the SAO.  *See* Md. Code (2008 Repl. Vol.), §15-407(b) of the Criminal Procedure Article ("C.P.").  But, the Maryland Court of Appeals recognized in *Rucker,* 316 Md. at 283, 558 A.2d at 402, that "the source of an agency's or official's funding is not dispositive of the agency's or official's status as a State government entity or local government entity." Rather, "the payment of wages is but one factor in determining whether an employer/employee relationship exists," to be considered in conjunction with a number of factors, including "'the power to select and hire the employee[,] the power to discharge, [and]…the power to control the

employee's conduct…." *Id.* at 283 n. 3, 558 A.2d at 403 n.3 (citation omitted).  *See, e.g.,*

*Penhollow v. Bd. of Com'rs for Cecil Cnty.*, 116 Md. App. 265, 296, 695 A.2d 1268, 1285 (1997)

(stating, with respect to sheriffs and deputy sheriffs, that "[t]he mere fact that they might also be

subject to administrative practices applicable to county employees, or that their salaries may be

paid through the county budget, does not alter their identity as state officials.").

The County does not control personnel decisions within the SAO; it is the authority of the

State's Attorney, an elected official, to "appoint two deputy State's Attorneys and the number of

assistant State's Attorneys necessary to staff the office."  C.P. §15-407(c).  Indeed, the Maryland

Court of Special Appeals has referred to state's attorneys as "state personnel" who "[p]erform[]

fundamental State government functions but [are] not…compensated by the State government."

*Conaway v. State*, 108 Md. App. 475, 489, 672 A.2d 162, 169 (1996).

In support of his claim that the individual defendants are employees of Carroll County,

plaintiff cites a "News Release" issued by the County commending the work of "Sheriff's

Services Employees" and "State's Attorney Employees";[55] noting that the SAO is funded by the

County; and observing that § 11-101 of the Carroll County Code of Public Local Laws and

Ordinances describes the duties of the Sheriff, indicating, in plaintiff's view, control of the

County over the Sheriff's Office.  Opposition to County at 7.  Plaintiff's position is unpersuasive.

Even if a press release were to be given weight in the manner of construction of statutes or case

law, the press release plainly refers to the employees in question as employed by "Sheriff's

Services" and the "State's Attorney."  As discussed, *supra*, the financial obligation imposed by

the State upon the County with respect to the SAO and "Sheriff's Services" does not determine

---

[55] The "News Release" was appended as Exhibit 1 to ECF 51, later superseded by ECF
75 and 76.

whether the individual defendants are employees of the County.  And, C.P. § 11-101 refers to the Sheriff's responsibilities as jailer, which are not at issue here.

Alternatively, plaintiff asserts that he has brought viable "*Monell*" claims against Carroll County, under a theory that the individual defendants are final policy makers for Carroll County, if not employees.  In *Monell v. New York City Department of Social Services,* 436 U.S. 658, 690-91 (1978), the Supreme Court determined that counties and other local governmental bodies may be liable under § 1983 based on the actions of individual defendants, but only if those defendants were executing an official policy or custom of the local government that resulted in a violation of the plaintiff's rights.  The Court said that, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury[,] the government as an entity is responsible under § 1983." *Id.* at 694.  *See also Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004).

"Section 1983 plaintiffs seeking to impose liability on a municipality must, therefore, adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).  "An official policy often refers to 'formal rules or understandings. . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'" *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (citations omitted).  However, "the governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances." *Id.* (citations omitted).

This case involves no racially discriminatory policies that have deprived plaintiff of his civil rights.  As much as plaintiff may insist to the contrary, the evidence does not show that he was treated in a racially discriminatory manner.

Plaintiff complains of defendant Culver's "policy" of "requesting that any applications for charges filed by either Mr. Strickland or Mr. Jeskey be reviewed by [the SAO] before any charges [were] issued."  State Motion Exh. 1 ¶ 3; *see also* Complaint ¶¶ 122, 229.  Yet, that "policy" applied to both Strickland and Jeskey.  The SAO did not fail to follow through with plaintiff's charges because he was African American.  Rather, as Culver states in his Affidavit, it was clear to them that Strickland and Jeskey were attempting "to enlist the criminal process to retaliate against one another."  State Motion Exh. 1 ¶ 4.

So, too, with plaintiff's complaints that "[t]he County has demonstrated a pattern and practice of a 'First Come, First Served' complaint policy," Complaint ¶ 156, and has a policy of "charging African American citizens of crimes based upon accusations by white citizens without any form of investigation…."  *Id.* ¶ 121.  All plaintiff can point to is that Schwartz's complaints against him for assault and violation of the protective order resulted in charges against him, while his complaints against her did not result in charges.  There is no evidence in the record that would suggest that this was due to plaintiff's race, rather than the fact that Schwartz's complaints against him appeared more meritorious than his own complaints against her, or that, by the time plaintiff began repeatedly to file charges against Schwartz and Jeskey, the intense acrimony between the three had become apparent to the SAO and its constituent employees.  Plaintiff also overlooks that Jeskey was prosecuted on drug charges, and convicted as a result of an investigation initiated by plaintiff's report.

As to plaintiff's complaints of unlawful speech-related policies, he asserts: "The County is liable under Monell [sic] because [of] the custom and policy adopted by the County's agents of retaliatory actions against those who speak out against injustice," *id.* ¶ 211, a policy which "attempts to chill the exercise of free speech by African Americans whom [sic] disagree with the County's discriminatory practices." *Id.* ¶ 157.   Yet, there is no evidence of retaliation against plaintiff for engaging in lawful First Amendment activities.   The only allegedly retaliatory incident plaintiff can point to is his arrest by Miller for driving on a suspended license.   Although plaintiff insists Noma "instructed" Miller to arrest him, *id.* ¶ 77, the arrest was based on probable cause; there is no evidence that the arrest was intended to chill plaintiff's speech rights.

A plaintiff may establish a government "custom" by showing that "a particular practice 'is so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law.'"   *Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 670 (D. Md. 2003) (*quoting Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)).   For a policy to be attributable to the municipality, the "decision maker" must be "the municipality's governing body, a municipal agency, or an official possessing final authority to create official policy." *Semple*, 195 F.3d at 712 (citations omitted).   Put another way, the decision must be made by "municipal officials authorized to make final decisions."   *Wright v. Town of Glenarden*, No. 95-2580, 1996 WL 350009, at *3 (4th Cir. June 26, 1996) (citation omitted).

Even assuming, *arguendo*, that the alleged "policies" fall within the ambit of *Monell,* plaintiff has cited no facts or law that would indicate that the SAO employees who promulgated them are individuals whose conduct "may fairly be said to represent official policy" of the County, so as to make the County liable for the alleged constitutional torts.   *Monell,* 436 U.S. at 694.   The Maryland Court of Special Appeals has indicated that a State's Attorney is not a final

policy maker for the county in which he or she serves.  *See Runnels v. Newell*, 179 Md. App. 168, 215-19, 944 A.2d 1183, 1211-13 (2008) (affirming the circuit court's dismissal of claims against Caroline County "insofar as those counts alleged that [the State's Attorney] was acting as an agent for the County when he wrongfully fired the appellants"), *rev'd on other grounds*, 407 Md. 578, 967 A.2d 729 (2009).  Plaintiff has not shown that the individual defendants are final policy makers for Carroll County.

## Conclusion

In sum, plaintiff has argued that (a) he was prosecuted for assault, after a woman claimed that he assaulted her; (b) he was arrested for driving on a suspended license, when his license was in fact suspended; and (c) the Carroll County SAO declined to prosecute charges brought by him against his ex-girlfriend and her new paramour because, in their view, the charges were not meritorious, but rather were brought as a result of the three using the legal system as a means for venting their personal frustrations against each other.  Plaintiff has already unsuccessfully brought this same litigation in State court, yet he has brought it again here, hoping for a different result.  This he will not find.  For the foregoing reasons, I will deny plaintiff's motions for summary judgment, and grant the motions for summary judgment brought by the State defendants; Miller and Tregoning; and Carroll County.


Date:  February 7, 2012                    _____/s/_____
                                           Ellen Lipton Hollander
                                           United States District Judge